## UNITED STATES CARTRIDGE CO. *v.* UNITED STATES.

No. 348. Argued January 15, 1932.—Decided February 15, 1932.

512

*Mr. Harry LeBaron Sampson* for petitioner.

*Assistant Attorney General Rugg,* with whom *Solicitor General Thacher,* and *Messrs. Claude R. Branch, Fred K. Dyar, Bradley B. Gilman, Clarence M. Charest,* and *Isadore Graff* were on the brief, for the United States.

MR. JUSTICE BUTLER delivered the opinion of the Court.

Petitioner sued to recover an alleged overpayment of income and profits taxes for 1918. The court made findings of fact, ruled in favor of petitioner as to a part of the amount and gave it judgment for $160,978.83, which is not here challenged. The court dismissed petitioner's complaint as to two other claims, which this writ brings up for consideration. One is on account of buildings erected by it for war purposes on leased land. The other involves the valuation of petitioner's inventories relating to government contracts. There is printed in the margin a statement showing the net income and taxes as determined by the Commissioner, the reduction made by the judgment, and the deductions claimed by petitioner and denied by the court.[1]

The substance of the findings as to the buildings may be stated as follows:

Petitioner, for some years before the war, had been a manufacturer of ammunition for small arms used in times

| [1] | | | |
|---|---|---|---|
| Net income | $1,792,432.58 | Taxes | $1,152,123.53 |
| Reduction by court | 195,362.67 | Taxes | 160,978.83 |
| Leaving income | 1,597,069.91 | Taxes | 991,144.70 |
| Deduction claimed on account of buildings | 327,937.35 | Taxes | 270,220.38 |
| Deduction on account of inventories | 500,473.19 | Taxes | 412,389.91 |

of peace. It carried on at Lowell, Massachusetts, principally in buildings rented from a power company. During the years 1911 to 1914, inclusive, its business was relatively small and not profitable. In 1914 it commenced making ammunition for use in the war, and for the purpose of continuing that business while the war should last, it constructed new buildings upon the power company's land at a cost of $802,499.49 pursuant to an agreement that it should have the right to use them rent free until December 31, 1924, and then hand them over to the power company. Until the armistice, at first for foreign governments and later for our own, it had orders, and used all the buildings up to their capacity, in the manufacture of war ammunition. There was no way of knowing when this demand would cease.

Petitioner did not expect to make military ammunition after conflict ended, and in fact received no orders after the armistice. It continued the commercial ammunition business but made no profit in any year from 1918 to the end of the lease. The buildings could not be rented. Those belonging to the power company had been incorporated into the new ones. The space so made was much greater than required for its commercial ammunition business. Petitioner, for the purpose of utilizing the excess, undertook the manufacture of some other things, but that business was small and resulted in loss each year. There was a garage, used during the war production but not needed afterwards. Petitioner attempted to operate the building as a public garage but, realizing no net return, rented it to others from October, 1923, until the end of the lease.

The Commissioner allowed deductions on account of the cost of the buildings for the years from 1914 to 1917, inclusive, amounting in all to $197,107.74, leaving as of the end of 1917, cost less depreciation, $605,391.75. In the settlement of its 1918 taxes petitioner claimed that, as

of the end of that year, the value of its right to use the new buildings during the remainder of the term was $190,969.86, and the Court of Claims found it not in excess of that amount. Petitioner claimed a deduction of the difference between the depreciated cost and such residual value. The Commissioner disallowed the claim on the ground that it had not abandoned the use of the buildings or permanently devoted them to a radically different use. He allowed $86,484.54, arrived at by distributing the cost of each building ratably over the period ending with the term of the lease. The difference between the deduction claimed and that allowed is $327,937.35. In its tax returns for the remaining years of the lease, petitioner claimed deductions on account of the buildings amounting in all to $190,969.86, but the Commissioner added to such deductions $327,937.35.

The Revenue Act of 1918, 40 Stat. 1077, controls and its pertinent provisions are printed in the margin.[2] The

---

[2] Sec. 234 (a). That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

(7) A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence;

(8) In the case of buildings . . . or other facilities, constructed . . . or acquired, on or after April 6, 1917, for the production of articles contributing to the prosecution of the present war, and in the case of vessels constructed or acquired on or after such date for the transportation of articles or men . . . there shall be allowed a reasonable deduction for the amortization of such part of the cost of such facilities or vessels as has been borne by the taxpayer, but not again including any amount otherwise allowed under this title or previous Acts of Congress as a deduction in computing net income. At any time within three years after the termination of the present war the Commissioner may, and at the request of the taxpayer shall, reëxamine the return, and if he then finds as a result of an appraisal or from other evidence that the deduction originally allowed was incor-

Government maintains that subsection (8) excludes the allowance claimed. The contention is without merit. The argument is that, by authorizing amortization in respect of buildings erected for war production after April 6, 1917, Congress denied allowances for obsolescence as to like buildings constructed before the war. But obsolescence and amortization are not synonymous. While in some connections like meaning may be attributed to them, they do not necessarily or generally refer to the same thing. Obsolescence may arise from changes in the art, shifting of business centers, loss of trade, inadequacy, supersession, prohibitory laws and other things which, apart from physical deterioration, operate to cause plant elements or the plant as a whole to suffer diminution in value. *Burnet* v. *Niagara Brewing Co.*, 282 U. S. 648, 654. *Gambrinus Brewery Co.* v. *Anderson*, 282 U. S. 638. Amortization as used in the Act is not so broad; it refers to deductions on account of such part of the costs of certain facilities as has been borne by the taxpayer, " but not again including any amount otherwise allowed." This safeguard against duplication of allowances on account of the same diminution in value shows that deductions for amortization were not intended to exclude obsolescence, but rather were to be made in addition or having regard to allowances deducted on account of obsolescence and the like.

The legislative history of the Act negatives the contention. In explanation of the deduction for amortization the Committee on Ways and Means, having charge of the measure, reported that many facilities provided for

---

rect, the taxes imposed by this title, and by Title III [war-profits and excess-profits tax] for the year or years affected shall be redetermined and the amount of tax due upon such redetermination, if any, shall be paid upon notice and demand by the collector, or the amount of tax overpaid, if any, shall be credited or refunded to the taxpayer in accordance with the provisions of section 252; . . .

war purposes would be of little value after termination of the conflict; that, under the law then existing, it was impossible to allow deductions other than for the "ordinary exhaustion, wear and tear, and depletion of such property" and that the purpose was "to allow special amounts for amortization, according to the peculiar condition in each case . . ."[3] When that report was made, and as the draft of the Act was originally passed by the House and amended and passed in the Senate, it contained no provision expressly authorizing allowances for obsolescence. Subsection (7) in the form in which it was finally adopted was formulated in conference much later than the committee report, and after the provision for amortization as finally enacted had been agreed to. See *Gambrinus Brewery Co.* v. *Anderson, supra,* 643. Manifestly, Congress intended by subsection (7) to establish a general rule and by subsection (8) to authorize, in a limited class of cases and under special circumstances, the amortization of certain costs by deductions not duplicating any other allowed by that or previous Acts of Congress.

Under the circumstances disclosed by the findings, the buildings erected by petitioner are not to be distinguished from equipment designed, constructed and suitable only for the performance of a single job or from brewery plants put out of use by prohibitory laws. The Government does not suggest that any part of the allowance claimed should have been deducted in petitioner's returns for years prior to 1918. It was impossible to know when the conflict would cease, but it was certain that, when demand for war materials ended, there necessarily would be great diminution in the value of the buildings. That remaining after the armistice, November 11, 1918, was prop-

---

[3] House Report 767, 65th Congress, 2d Session, p. 10. Senate Report 617, 65th Congress, 3d Session, p. 7.

erly to be regarded as in the nature of salvage. The depreciated cost less the value of petitioner's right to use the buildings after 1918 must be taken into account for the proper determination of petitioner's 1918 income and profits taxes. *Gambrinus Brewery Co.* v. *Anderson, supra.* *Burnet* v. *Niagara Brewing Co., supra.*

The findings as to inventories may be stated as follows:

At the end of 1918, petitioner had large quantities of material, acquired for the production of war ammunition to be supplied by it under four contracts with the Government. The contracts provided that the Chief of Ordnance, upon termination or limitation of the war, might notify petitioner that any part of the articles then remaining undelivered should not be manufactured or delivered, and that: " In the event of such complete or partial termination [of performance of the contract] the United States shall inspect all completed articles then on hand and such as may be completed within thirty (30) days after such notice and shall pay to the contractor the price herein fixed for all articles accepted . . . The United States shall also pay to the contractor the cost of materials and component parts purchased by the contractor for the performance of this contract and then on hand . . ." together with other allowances mentioned.[4]

In December, 1918, the Chief of Ordnance caused letters to be sent petitioner in respect of each of its contracts stating: " You are requested in the public interest immediately to suspend further operations under your contract . . . and incur no further expenses in connection with the performance of said contract. This request is made with a view to the negotiation of a supplemental contract providing for the cancellation, settlement and

[4] Each of the contracts contained a provision substantially the same as that quoted. One of them, GA–126, did not give petitioner a right to continue production for 30 days after termination.

adjustment of your existing contract, in a manner which will permit of a more prompt settlement and payment than will be practicable under the terms of said existing contract. Please acknowledge receipt of this notice immediately, and indicate your decision as to compliance with or rejection of this request. Upon notice of your compliance, a representative of the Ordnance Department will forthwith take up with you the proposed negotiation." [5] Before the end of the year petitioner complied with these requests and ceased production under the contracts.

At the end of that year there was no market for the materials in the inventories; they were not saleable at any price approaching cost; it was wholly uncertain what amounts might be obtained in settlement, and no negotiations for adjustments or settlement had been made.

After negotiations involving much time and expense, partial settlements were reached in 1920 under which the Government took over and paid petitioner's cost for most of the raw material and work in process, except labor and overhead items chargeable to the latter. In final settlements in 1921 and 1922 there were compromises under which the Government paid a portion of the cost of some items and made no allowance for others.

Petitioner kept its books on the accrual basis and elected to price its inventories at cost or market, whichever was lower. The difference between petitioner and the Commissioner as to 1918 taxes was whether inventories of material on hand at that date should be taken at $231,-615.43, the then market value, or at $732,088.62, which was made up of amounts eventually realized by petitioner under the contracts of settlement. The latter was used by the Commissioner.

---

[5] The suspension requests were not in identical words, but in substance all were the same.

Mere inspection of the suspension requests discloses that they were not intended to be the notices provided for in the clauses authorizing the Government to terminate manufacture or deliveries. *College Point Boat Corp.* v. *United States,* 267 U. S. 12, 15. And upon petitioner's compliance with such requests the contract provisions as to payments by the Government to petitioner of cost were superseded. At the end of 1918, the Government was not bound to take or to pay petitioner for any property covered by the inventories. Petitioner had no assurance as to what settlements finally would be made or that it ever would receive more than the then market value of the inventories. Up to the time of the partial settlements in 1920, petitioner had no agreement that it would be paid the cost of any part of the property. Cf. *Lucas* v. *American Code Co.,* 280 U. S. 445, 449.

Petitioner's position was not different from that of a merchant whose stock on hand at the end of the tax year and not covered by contracts of sale had declined in value and was inventoried below cost. In such case amounts in excess of inventory value realized from sales in subsequent years are attributable to such years. Gains or losses must be accounted for in the year in which they are realized. The purpose of the inventories is to assign to each period its profits and losses. *Lucas* v. *Structural Steel Co.,* 281 U. S. 264, 268. The tax laws are calculated to produce revenue ascertainable and payable at regular intervals. Otherwise it would not be practicable to devise methods of accounting, assessment or collection capable of operation. *Burnet* v. *Sanford & Brooks Co.,* 282 U. S. 359, 365. The taking of petitioner's inventories at market value was essential to a proper disclosure of its financial position. Regulations in force at the time of the Commissioner's determination declare that items such as claims for compensation under canceled government contracts constitute income for the year in which

they are allowed or their value is otherwise definitely determined. Regulations 65, Article 50. And see Regulations 45, Articles 1582–1584, as amended by T. D. 3296. On the facts found there was no warrant for including in petitioner's 1918 taxable income on account of such inventories any amount in excess of market value at the end of that year.

The lower court's dismissal of petitioner's claims for deduction of $327,937.35 on account of buildings and $500,473.19 on account of inventories cannot be sustained.

*Reversed.*