## UNITED STATES v. REAL ESTATE–LAND TITLE & TRUST CO.*
### No. 6493.

Circuit Court of Appeals, Third Circuit.
March 13, 1939.

*Rehearing denied May 1, 1939.

James W. Morris, Asst. Atty. Gen., Sewall Key, J. Louis Monarch, Lester L. Gibson, Sp. Assts. to Atty. Gen., J. Cullen Ganey, Jr., U. S. Atty., of Bethlehem, Pa., Lester L. Gibon, Sp. Asst. to Atty. Gen., and Thomas J. Curtin, Asst. U. S. Atty., of Philadelphia, Pa., for the United States.

Joseph A. Lamorelle and Joseph Neff Ewing, both of Philadelphia, Pa. (Saul, Ewing, Remick & Saul, of Philadelphia, Pa., of counsel), for appellee.

Before DAVIS and BIGGS, Circuit Judges, and WATSON, District Judge.

BIGGS, Circuit Judge.

The Real Estate-Land Title and Trust Company, a Pennsylvania corporation, the appellee, sued the United States in the court below for a refund of income tax. The cause of action arises out of the fact that in December, 1930, the appellee filed a claim for refund for the fiscal year ending October 31, 1928, in the sum of $153,-125, alleging as the basis of its claim that it was entitled to deduct a loss due to obsolescence of a title insurance plant formerly owned by Land Title and Trust Company. The Commissioner of Internal Revenue disallowed the claim. The suit at bar was instituted pursuant to the provisions of Section 128(a) of the Judicial Code, as amended by the Act of February 13, 1925, 28 U.S.C.A. § 225(a). Judgment was entered for the appellee in the sum of $107,270.81, with interest as appears. The appeal at bar is from this judgment.

The question presented for our determination is whether or not the court below erred in finding that the appellee had sustained a loss during the fiscal year commencing upon November 1, 1927, and ending upon October 31, 1928, in the sum of $875,000, this amount purporting to represent the difference between the fair market value of the title plant upon March 1, 1913, and its value upon October 31, 1928. The trial judge found that the appellee was entitled to deduct this amount by way of obsolescence from its gross income for the fiscal year designated. The United States contends that this finding by the trial court was erroneous.

A brief statement of the facts leading to the dispute is necessary. The Real Estate-Land Title and Trust Company, the appellee, was formed by a merger between Real Estate Title Insurance and Trust Company, West End Trust Company and Land Title and Trust Company. The agreement of merger was executed upon October 3, 1927. The merger actually took place upon October 31, 1927, and the new company, the appellee, held its organization meeting upon the same day. The new company opened its doors for business upon November 1, 1927. Land Title and Trust Company prior to the merger had carried on a business of insuring titles to real estate in Philadelphia and for this reason possessed a title insurance plant. Real Estate Title Insurance and Trust Company also had carried on a title insurance business in Philadelphia and likewise possessed a title insurance plant. Prior to the merger Land Title and Trust Company carried its title plant upon its books at a valuation of $275,000, and Real Estate Title Insurance and Trust Company carried its title plant upon its books at a value of $143,000. For the purposes of the merger the value of the title plant of Real Estate Title Insurance and Trust Company was appreciated by $657,000 to a total value of $800,000, and the value of the title plant of Land Title and Trust Company was appreciated by $525,000 to a value of $800,-000. When the merger took place the two title plants were transferred to the appellee at a valuation of $800,000 each or at a total valuation of $1,600,000, and the appellee took the two title plants as an asset at a valuation of $1,600,000.

Up to the time of the merger Land Title and Trust Company had issued 342,067 policies of title insurance and Real Estate Title Insurance and Trust Company had issued 436,950 such policies. All of the parties to the merger knew or should have known that the new corporation, the appellee herein, would acquire two title plants designed and intended for the same purpose, namely the searching of titles of properties in Philadelphia. It appears from the evidence that the plant belonging to Land Title and Trust Company was not as efficient a plant as that belonging to Real Estate Title Insurance and Trust Company. The plant of Land Title and Trust Company could be operated effectively with approximately one-third the number of employees required by the other.

A witness for the appellee testified that at the time the merger agreement was signed there was no plan for the disposition of the two plants. After the execution of the merger agreement but prior to the actual consummation of the merger an

officer of the Land Title and Trust Company and an officer of the Real Estate Title Insurance and Trust Company examined the title plants and looked into the situation created by possession of two such units. Following this examination, it was decided that the appellee would use the title plant formerly belonging to the Real Estate Title Insurance and Trust Company and the plant formerly belonging to Land Title and Trust Company should be stored. The daily records required to keep the plant up to date were not made after this inspection. The record shows that this failure to keep the plant to date occurred no later than October 31, 1927, and probably took place a few days earlier. The plant however was used in connection with certain sheriff's sales occurring on the first Monday in November, 1927, and certain other information was obtained from this plant and made use of by the appellee from time to time for a period of some weeks thereafter. There is no evidence, however, to show that the plant was used in connection with new searches of properties after October 31, 1927.[1] The plant was stored in the basement of a building occupied by the appellee at 517 Chestnut Street, between the second week in October and the end of the first week in November, 1927. Shortly after the consummation of the merger, the plant was offered for sale by the appellee for a price of $1,000,000, but no offer to purchase it was received by the appellee in any amount. It appears also that during the first year after the merger it would have been necessary to have made 227,498 entries in the records of the plant in order to keep it up to date. At the time of the merger, there were three title plants in Philadelphia and the appellee acquired two of them by the merger.

The pertinent statute, Section 23 of the Revenue Act of 1928, c. 852, 45 Stat. 791, 799, 800, 26 U.S.C.A. § 23(l) is as follows:

"Deductions from gross income.

"In computing net income there shall be allowed as deductions:

\* \* \* \* \* \*

"(k) Depreciation. A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence."

█ Deductions from gross income cannot be made for obsolescence or depreciation of property unless used in the trade or business of the taxpayer in the taxable year in question. The trial court reached the conclusion that the plant had been used by the appellee within the meaning of the statute. That use at most was very slight. Assuming, however, that the use by the appellee of the plant was sufficient to come within the purview of the statute, it then becomes necessary to determine whether or not the sum of $875,000 claimed by the appellee as deduction from its gross income is a reasonable allowance for obsolescence and whether in fact there was obsolescence.

█ The fact of the matter is that the appellee, following the merger, had two title plants upon its hands each designed to accomplish substantially the same work. It was economically undesirable to make use of both. The appellee therefore selected and made use of that plant which it felt could be most economically operated. It thereupon failed to keep the other plant up to date by placing the necessary entries in its files. At any time during the taxable year the appellee by the expenditure

---

1 The testimony of the title officer of Land Title and Trust Company is illuminating. He testified:

"A. The only use made of them (the records in the plant) in October, that I know of, was that the block plan books, which were sent down first, were used as a means of ascertaining what insurances were involved in connection with the forthcoming Sheriff sales of November, it having been the custom to look at such insurances to make sure that the Sheriff sales were not upon any liens which affected the title as of the date that we had insurance—to any such properties. And outside of that I have no personal knowledge of what reference may have been made, from time to time, after the first of November, when the new company went into operation, what references may have been made from time to time to that plant.

"Q. You do know that they looked up some things from time to time? A. But I believe, from time to time, there has been, very occasionally, a check-up of some information from material in the plant to save a visit to City Hall.

"Q. Did they increase or decrease after the plant was stored there? A. I think that it decreased as the time went by, so that there was practically little or no use made of it by the end of the year following the merger."

of funds not incommensurate with the value placed upon the plant at the time of the merger, $800,000, or the price at which it was offered for sale after the merger, $1,000,000, could have brought the plant to date and could have rendered it commercially useful as theretofore. In the case at bar the basis offered for obsolescence is really that of the duplication of property.

Obsolescence is always difficult to define. In Burnet v. Niagara Brewing Co., 282 U.S. 648, 653, 654, 51 S.Ct. 262, 264, 75 L.Ed. 594, Mr. Justice Butler, construing Section 234(a) (7) of the Revenue Act of 1918, 40 Stat. 1078, stated: "The word is much used, and its meaning depends upon and varies with the connections in which it is employed. It has been said to be 'the condition or process by which units gradually cease to be useful or profitable as a part of the property, on account of changed conditions.' Obsolescence is not necessarily confined to particular elements or parts of a plant; the whole may become obsolete. Obsolescence may arise as the result of laws regulating or forbidding the particular use of the property as well as from changes in the art, the shifting of business centers, loss of trade, inadequacy, or other causes." In United States Cartridge Co. v. United States, 284 U.S. 511, 516, 52 S.Ct. 243, 245, 76 L.Ed. 431, Mr. Justice Butler, construing the same section, stated: " 'Obsolescence' may arise from changes in the art, shifting of business centers, loss of trade, inadequacy, supersession, prohibitory laws, and other things which, apart from physical deterioration, operate to cause plant elements or the plant as a whole to suffer diminution in value." In Gambrinus Brewery Co. v. Anderson, 282 U.S. 638, 645, 51 S.Ct. 260, 262, 75 L.Ed. 588, he stated again, referring to Section 234(a) (7): "The statute contemplates annual allowance for obsolescence just as it does for exhaustion, wear, and tear. That is necessary in order to determine true gain or loss because postponement of deductions to cover obsolescence until the property involved became obsolete would distort annual income. It is well understood that exhaustion, wear, tear, or obsolescence cannot be accurately measured as it progresses and undoubtedly it was for that reason that the statute authorized 'reasonable' allowances to cover them in order equally to spread that element of operating expenses through the years."

Obsolescence has been said to be " * * * the condition or process by which units gradually cease to be useful or profitable as a part of the property, on account of changed conditions * * *" and " * * * the state or process of becoming obsolete". Law of Federal Income Taxation, Paul & Mertens, Vol. 2, Section 20.110, citing First National Bank of Key West v. Com'r, 26 B.T.A. 370. Obsolescence is not always subject to accurate measurement as it progresses. It was for this reason that the word "reasonable" was inserted in the statute, permitting the losses occurring by reason of obsolescence to be spread over the years between the beginning and end of the process.

In the light of the definitions of obsolescence set forth above, we perceive the purpose of the statute, granting a reasonable allowance by way of obsolescence to the taxpayer, to be the allowance to the taxpayer of deductions based upon plant, machinery or equipment becoming inutile due to changing competitive conditions, improvements resulting from invention, or from prohibitory statutes. The object of the statute is to permit a taxpayer to regain capital invested by him in an enterprise, the equipment, machinery or material in which his capital has been placed becoming obsolete, because time itself brings improvements or changed conditions. To put the matter shortly, obsolescence may be claimed when machinery or a plant suffers loss in use not because of action or lack of it upon the part of the taxpayer, but because of the effect of general conditions over which he has no control.

We think it is apparent that the loss claimed by the taxpayer cannot be brought within any established definition of obsolescence. The title plant did not lose its usefulness because of changing economic conditions or by reason of any circumstances over which the taxpayer lacked control. Such usefulness as was lost throughout the taxable year in question was lost because of the failure of the taxpayer to keep the plant's records up to date. To hold that the plant became obsolete within the taxable year is contrary to the facts. True, it was not as useful at the end of the taxable year as at its be-

ginning, but to conclude that a title plant created between the years 1886 and 1887, steadily added to and kept up to date until October, 1927, loses its usefulness in the following twelve months because of a failure to add current notations to its records is contrary to reason. There is no adequate evidence of record in the case at bar to sustain such a view. Indeed, there is express evidence to the contrary in view of the fact that the plant in question was offered for sale for the sum of $1,000,000 some months after November 1, 1927. Moreover, we think that in a true sense the deterioration suffered by the plant in the period from November 1, 1927, to October 31, 1928, was physical deterioration, and as such may not be claimed as obsolescence within the definition set forth in United States Cartridge Co. v. United States, supra. The loss suffered by the appellee within the taxable year is more closely allied to depreciation, which, continued from year to year thereafter, might result upon some future date in a complete loss of value in the plant. Such complete loss would occur when the cost of bringing the plant to date would exceed the value of the existing records in the plant. This is all the more apparent when it is observed as was testified to at the trial in the case at bar that a complete title insurance plant consists of the following parts: first, abstracts of public records, including deeds, mortgages, sheriff's assignments, releases and so forth, indexed, plotted and located on plans of the City as subdivided into sections and blocks; and, second, separate abstracts of title, searches and opinions in each matter for which the title company had issued its title insurance policy or obligation of a similar nature.

In our opinion the circumstances of the case at bar indicate the abandonment of a capital asset by the appellee. The situation presented is analogous to that which would occur if a public utility company with adequate power facilities of its own bought out a competing utility operating in the same territory, and thereafter, making no use of the power plant purchased and not maintaining it in running order, claimed its value, less scrap value, by way of obsolescence within the taxable year after its acquisition. It is obvious that obsolescence cannot be maintained upon such a basis.

It is not necessary for us to pass upon the question of whether or not the deduction here sought might be available to the appellee upon the theory of the abandonment of a capital asset. The appellee cannot claim the deduction upon such a ground because it appears that the claim for refund asserted by the appellee was asserted by it solely upon the ground of obsolescence. In the suit at bar therefore the appellee might be permitted to take only the deduction which it claimed. Such is the basis upon which the United States consents to be sued. See Rock Island, Arkansas & Louisiana R. R. Co. v. United States, 254 U.S. 141, 41 S.Ct. 55, 65 L.Ed. 188; Reid v. United States, 211 U.S. 529, 538, 29 S.Ct. 171, 53 L.Ed. 313; Munro v. United States, 303 U.S. 36, 41, 58 S.Ct. 421, 82 L.Ed. 633. We may state, however, that the circumstances of the case at bar seem to us to be closely analogous to those presented in Newspaper Printing Co. v. Commissioner, 3 Cir., 56 F.2d 125, decided by this court.

In conclusion we state that the amount of the deduction allowed to the taxpayer by the court below seems to us to be not supported by the evidence. Two experts, testifying on behalf of the appellee, stated that the value of the title plant as of March 1, 1913, was between $1,000,000 and $1,250,000. Yet it was carried upon the books of the Land Title and Trust Company in the sum of $275,000, which at the time of the merger was increased to $800,000. Within some months following the merger a price was set upon the plant of $1,000,000. None the less it was found as a fact by the court below that the loss to the appellee by way of the obsolescence of the plant, less scrap value, was $875,000. This is $75,000 more than the value at which the plant was taken into the merged corporation and more than three times the value at which the plant was carried upon the books of the constituent company just prior to the merger.

The judgment of the court below is reversed and the cause is remanded with the direction to enter judgment in favor of the defendant-appellant.