Eastern Building Corporation v. Commissioner.
Eastern Bldg. Corp. v. Commissioner
Docket No. 112634.
United States Tax Court
1944 Tax Ct. Memo LEXIS 320; 3 T.C.M. (CCH) 267; T.C.M. (RIA) 44087; March 23, 1944
*320 William H. Hayes, Esq., for the petitioner. Arthur Groman, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: This proceeding involves an income tax deficiency of $9,019.72 for the calendar year 1939. Two questions are presented, namely, (1) whether petitioner is entitled to a deduction of $111,542.88 in the taxable year for obsolescence, additional depreciation or loss of useful life, and (2) whether petitioner realized taxable income in the taxable year by reason of the purchase, after June 29, 1939, of $57,500 face value of its own bonds for $37,671. The tax return for the year in question was filed on an accrual basis with the collector for the second district of New York. The case was submitted upon a stipulation of facts, oral and documentary evidence. The stipulated facts are found accordingly, but we set forth only so much thereof, together with additional material facts, as are necessary to an understanding of the issues. Findings of Fact Petitioner is a New York corporation with its principal place of business in New York City. It is presently in reorganization under Chapter X of the Bankruptcy Act of 1938 with James A. Beha, Trustee. *321 Petitioner's only valuable asset is a parcel of New York City real estate upon which it, in 1921, constructed a building at a cost of $866,026.34. The land had been purchased for $1,764,060.14 within the same year. The building was erected for use as a post office and conformed to plans approved by the Post Office Department. It was leased to the United States for a term of 20 years commencing October 1, 1921, with a 10-year renewal option. The rental was $400,000 for the first year and $300,000 per year thereafter. Under the lease petitioner was obliged to spend not in excess of $200,000 for furniture, fixtures and their repair and was to pay all taxes and assessments. The United States occupied the building until August 31, 1939, when the lease was surrendered and the premises vacated pursuant to notice given May 27, 1939. No rentals were paid by the government thereafter. The property remained vacant, although extensive efforts were made to secure a new tenant, until December 15, 1941 when Carl L. Norden, Inc., a war work contractor, took possession under a lease terminating April 30, 1945. This lease called for a total rental of $278,958.33 and petitioner agreed to expend $40,000 *322 in repairs and renovations. The building is a 4-story steel and concrete fireproof structure approximately 240 feet long by 140 feet wide, and designed to carry four additional stories. It is of factory type finish. Window frames and sashes, which substantially fill both sides of the building and provide excellent natural lighting, are of the factory type. The floor area is not partitioned with the exception of the lavatory spaces at either end. The first floor contains a covered loading platform extending the length of the building. The structure is equipped with four freight elevators adjacent to the loading platforms but some 60 feet from the street entrance. It has a stairway in each corner which leads to the roof. It has no passenger elevators and no sprinkler system. The permissible live loads per square foot in pounds, as determined by the Bureau of Buildings for the City of New York, are 120 for the second, third and fourth floors, 150 for the first floor and 300 for the loading platforms. The only features of the building which were peculiar to post office usage were the lookout galleries and the chutes. The galleries were not an integral part of the building, were easily *323 removed, and in fact have been removed. The property is located in what is primarily a heavy industrial district. Most of the buildings in the area are constructed to withstand a live load of not less than 200 pounds per square foot and only such buildings are suitable for the floor loads imposed by heavy industries. Thesr are a few other buildings in the district with permissible floor loads no greater than that allowed for petitioner's building. Petitioner's building could not practically be converted into a heavy industry building but it does meet the New York City Building Ordinance requirements for light manufacturing and storage purposes. The present tenant has machinery on all floors and heavy machinery in the basement. It is well located with reference to both freight and passenger transportation facilities. During the period from its erection to January 1, 1939, depreciation was allowed for income tax purposes at the rate of 2 1/2 percent of cost based upon an estimated useful life of 40 years. On the income tax return for 1939 the basis for depreciation was reduced to $846,561.32 by deducting from cost income attributable to the discharge after June 29, 1939, of certain *324 bonded indebtedness of the petitioner. The consent to the regulations prescribed under section 113 (b) (3) of the Internal Revenue Code on Form 982 was attached to the return. The unrecovered cost of the building on January 1, 1939 was $492,533 and on September 1, 1939, $474,765.89, excluding the reduction mentioned above. Since 1924 the property has been subject to a mortgage securing an issue of bonds. On June 29, 1939, there were outstanding $979,500 principal amount of such bonds. On July 25, 1939, petitioner retired $29,000 principal amount of such bonds for which petitioner paid $18,756, and on November 1, 1939, it retired $28,500 principal amount for which it paid $18,915. The income arising from these transactions amounted to $19,465.02 which is the sum deducted from the cost basis of the building. On July 24, 1939, the balance sheet of the petitioner, taken from its books, was as follows: Assets and Deferred Charges
Land
$1,764,060.14
Building
$866,026.34
Less Reserve for Depreciation
385,122.88
480,903.46
Furniture and Fixtures
$157,525.68
Less Reserve for Depreciation
157,021.41
504.27
Investment
$ 3,000.00
Loan Receivable
25,000.00
28,000.00
Own Bonds Purchased
42,500.00
Bond Sinking Fund - Balance
803.01
Cash on Deposit
2,744.22
Accrued Interest on Own Bonds
445.00
Prepaid Expenses
14,456.00
Total
$2,334,416.10
Liabilities and Capital
First Mortgage Bonds Outstanding
$ 979,500.00
Due to Sinking Fund Trustee
8,626.46
Capital Stock Tax Accrued
1,848.00
Federal Income Tax Accrued
12,758.32
Due to Seymour Corp.
23,000.00
Surplus Account
168,683.32
Capital Stock
1,140,000.00
Total
$2,334,416.10
*325 On October 31, 1939, the balance sheet of petitioner, taken from its books, was as follows: Assets and Deferred Charges
Land
$1,764,060.14
Building
$866,026.34
Less Reserve for Depreciation
390,535.54
475,490.80
Furniture and Fixtures
$157,525.68
Less Reserve for Depreciation
157,323.93
201.75
Investment
$ 3,000.00
Loan Receivable
25,000.00
28,000.00
Own Bonds Purchased
28,500.00
Bond Sinking Fund - Balance
803.01
Cash on Deposit
4,517.50
Prepaid Expenses
5,944.25
Total
$2,307,517.45
Liabilities and Capital
First Mortgage Bonds
$ 950,500.00
Due to Sinking Fund Trustee
8,626.46
Federal Income Tax Accrued
6,379.16
Bond Interest Accrued
23,050.00
Due to Equipment Liquidating Co.
200.00
Due to Seymour Corporation
20,000.00
Surplus Account
158,761.83
Capital Stock
1,140,000.00
Total
$2,307,517.45
The $3,000 investment shown on the balance sheets represented 3,000 shares of stock of North East Corner 34th Street and 11th Avenue Corporation. The loan receivable represented a loan to the same corporation. The loan and investment were both worthless on July 24, 1939 and October 31, 1939. On July 24, 1939, the fair market *326 value of the property in question was $375,000, of which $170,000 was allocable to the land and $205,000 allocable to the building. On October 31, 1939, the value of the land was the same but the value of the building was $25,000 less due to the surrender of the government's lease. The assessed value of the property in 1939 was $1,725,000 and real estate taxes were approximately $50,000. Insurance cost about $2,000 annually. Opinion Petitioner's only valuable asset was a building and the land upon which it was situated. In its tax return for the year 1939 it claimed deductions for depreciation on the building in the amount of $21,164.03 and obsolescence of $111,542.88. The respondent disallowed the latter deduction. Petitioner alleges that respondent erred "in disallowing deduction for obsolescence and/or additional depreciation and/or loss of useful life, actually sustained in the sum of $111,542.88." The first question is whether respondent did so err or, put the other way, whether petitioner is entitled to a deduction in such amount. In view of the breadth of petitioner's above quoted citation of error, we think it appropriate to make some preliminary observations designed to *327 narrow the issue. A deduction for complete and final loss of useful life is essentially different from a deduction on account of obsolescence. Olean Times-Herald Corporation, 37 B.T.A. 922. The former, in the case of corporations, is, in proper circumstances, allowable under section 23(f) of the Internal Revenue Code. The grounds for an obsolescence deduction, as well as depreciation, are defined in section 23(l). Since the circumstances giving rise to deductions under section 23(f) and 23(l) must necessarily be different, it follows that the same set of facts can not establish a right to a given deduction under both subsections. See Becker v. Anheuser-Busch, Inc., 120 Fed. (2d) 403, certiorari denied 314 U.S. 625. Here no argument was advanced with reference to the deductibility of $111,542.88 because of loss of useful life. Furthermore, no such argument would have been compelling, for it is clear that the building was neither discarded, abandoned nor sold, a necessary requirement to a deduction for loss. Olean Times-Herald Corporation, supra;Ewald Iron Co., 37 B.T.A. 798. *328 Quite the contrary, the building was retained by petitioner and again rented, thus establishing that its useful life was not exhausted in 1939. Jordan C. Skinner, 47 B.T.A. 624. Apparently petitioner uses the term "additional depreciation" as a synonym for obsolescence. Certainly, it makes no contention that it is entitled to an accelerated or abnormal depreciation based upon abnormal wear and tear which would shorten the building's original estimated useful life. Petitioner's argument presupposes a lack of use. Moreover, the cases upon which it relies bear solely upon the question of obsolescence and no evidence was offered in an effort to support a fivefold increase in the rate of depreciation. Hence, it may fairly be said that the real question is confined to the pr-priety of allowing a deduction of $111,542.88 for obsolescence and further discussion will be so limited. Petitioner bases its obsolescence deduction claim on the ground that the abandonment of the building's use as a post office made it obsolete for the purpose for which it was erected and diminished the value to no more than salvage. But the fact that the particular use for which *329 a building was erected is discontinued does not, in itself, denominate obsolescence. Southeastern Building Corporation, 3 T.C. 381; McCabe Lathe & Machinery Co., 9 B.T.A. 1137. Moreover, the facts do not sustain the assertion that the building had only salvage value upon the government's cancellation of the lease on August 31, 1939, or that the government's act in so doing was the cause of any substantial diminution in its value. The cost of the building in 1921, a period of inflation, amounted to $866,000. Its fair market value at the time the Post Office Department vacated the building in 1939 was $180,000. Real estate values were depressed in 1939. Petitioner's own expert witness testified that the structure was worth only about $25,000 more during the earlier part of 1939 while the lease to the United States was still in effect. It thus seems evident that the decline in the value of the building was not due to the government's abandonment thereof, except to the extent of $25,000, but rather was due to changes in the real estate market and the normal consequences of age and wear. However that may be, it is well established *330 that a mere decline in value while the asset is still in use does not afford a proper basis for an obsolescence deduction. Detroit & %windsor Ferry Co. v. Woodworth, 115 Fed. (2d) 795, cert. denied 312 U.S. 692; First National Bank of Key West, 26 B.T.A. 370; United Business Corporation of America, 19 B.T.A. 809, affirmed on another point 62 Fed. (2d) 754, cert. denied 290 U.S. 635. It can not here seriously be urged that the building was no longer in use after August 31, 1939. It remained petitioner's principal asset and, hence, its sole reason for continued existence, it was still carried on its books (and at cost), every endeavor was made to rerent it, and a new tenant did take possession some two years later. See State Line & Sullivan R. R. Co. v. Phillips, 98 Fed. (2d) 651, cert. denied 305 U.S. 635. That petitioner failed to secure the same rental is not at all surprising. It could scarcely expect to find another benefactor who would pay $300,000 *331 per year for a property valued at $350,000 or, for that matter, its 1921 value. Nor is this circumstance material. The falling off of revenue is no evidence per se of a shortening of the property's economic life giving rise to an obsolescence deduction. Southeastern Building Corporation, supra;Anna J. Cotton, 25 B.T.A. 1158, affirmed on another point 68 Fed. (2d) 436; Detroit & Windsor Ferry Co. v. Woodworth, supra; McCabe Lathe & Machinery Co., supra.We are also unable to agree that an asset rentable at a profit and having a fair market value of $180,000 has been reduced to salvage. Petitioner relies upon three Supreme Court decisions or language contained therein. They are Real Estate-Land Title & Trust Co. v. United States, 309 U.S. 13; U.S. Cartridge Co. v. United States, 284 U.S. 511; and Burnet v. Niagara Falls Brewing Co., 282 U.S. 648. The taxpayer in Southeastern Building Corporation, supra, a proceeding involving facts similar *332 to those present here as well as identical issues, relied upon the same decisions. We there reviewed them in some detail, together with other cases concerning obsolescence, and concluded that the following rule evolved: * * * in a case where there is no abandonment of the property, actual or contemplated, the taxpayer will be allowed a deduction for obsolescence if he sustains the burden of proving that normal deductions for depreciation based upon the original estimated life of the property will be insufficient to restore to him the basis of his property, because the original estimated life of the property has been cut short as a result of the property's having been rendered inutile for the function it performed prior to the event which caused the alleged diminution of value. The application of this rule to the instant case requires the holding that petitioner has failed to show itself entitled to a deduction for obsolescence. As pointed out above, the building was not abandoned. Its original estimated useful life was 40 years and annual depreciation has been computed on that basis. By 1939 petitioner had recovered approximately $400,000 of the building's cost through depreciation *333 and, by continuing to take annual deductions at the rate of 2 1/2 per cent, to which respondent makes no objection, the entire basis will be restored by 1961. There is nothing in this record which we deem sufficient to prove that the building will become useless prior to 1961 or, if so, when. True, it is constructed to withstand live floor loads not to exceed 120 pounds per square foot, heavy industries require heavier built structures and the area in which the building is located is tenanted largely by heavy industries. However, this does not demand a conclusion that the building will become unrentable before 1961. It is a modern fireproof structure with excellent natural lighting, equipped with freight elevators, four stairways and adequate plumbing, and it is very accessible to transportation facilities. It apparently meets the requirements of its present tenant and warrants a net rental of $72,000 per year. We see no reason to believe that it will fail to attract tenants in the future. There are some light industries in the neighborhood and certainly nothing is to prevent others from occupying petitioner's building. What we have said is sufficient to dispose of the obsolescence *334 question. However, it might be worth while to point out that petitioner must fail on a wholly different ground. Petitioner seeks a determination that it is entitled to a deduction for obsolescence of $111,542.88. But neither by the pleadings, stipulation, testimony nor briefs are we apprised as to how petitioner arrived at this particular figure. The obsolescence deduction is designed to care for losses of capital which take place over a longer period than the taxable year, and consequently, the taxpayer must establish a period longer than the taxable year over which period the asset is becoming obsolete and at the end of which it will be obsolete. Olean Times-Herald Corporation, supra; Detroit & Windsor Ferry Co. v. Woodworth, supra; State Line & Sullivan R. Co. v. Phillips, supra.Petitioner has not done this. There is nothing in the record upon which to base a rate of obsolescence. Without such evidence we could not determine obsolescence deduction in any amount, much less approve a deduction of $111,542.88. For the reasons assigned, we hold that respondent did not err in disallowing the deduction. The second issue is *335 whether petitioner realized taxable income by reason of the purchase of its own bonds for less than their face value. Respondent determined that, through such purchases on July 25, 1939 and November 1, 1939, petitioner realized a net profit of $19,237.54 and he added this amount to petitioner's 1939 taxable income. Section 22(b)(9) of the Internal Revenue Code, added by section 215(a) of the Revenue Act of 1939, and applicable to so much of the year in question as follows June 29th, provides that, in the case of a corporation, there shall be excluded from gross income the amount of any income of the taxpayer attributable to the discharge of an indebtedness evidenced by a security for which it is liable, if it is established to the satisfaction of the Commissioner that at the time of the discharge the taxpayer was in an unsound financial condition and if the taxpayer files a consent to the regulations prescribed under section 113(b)(3) then in effect. Petitioner relies upon this section of the statute to sustain its right to the exclusion of the income. It filed the prescribed consent and it is stipulated that a portion of petitioner's bonded indebtedness was discharged for a specified *336 amount less than the indebtedness with a resultant gain. The controversy is over the question of whether petitioner was or was not in an unsound financial condition when the indebtedness was discharged. Respondent further contends that, regardless of the correct answer to the above question, petitioner is not entitled to the exclusion since it has failed to establish to respondent's satisfaction that it was in an unsound financial condition at such times, as is evidenced by the notice of deficiency. We first consider this last mentioned contention. Apparently respondent believes his determination final and subject to no review irrespective of its soundness or propriety. We do not regard the statute as having invested respondent with such absolute powers. The statutory terms are analogous to those used in section 23(k)(1) wherein is authorized the deduction of partial worthlessness of bad debts in the following language: "* * * when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt * * *." This has been construed to give respondent discretionary powers which are not absolute but which must be exercised reasonably and not arbitrarily. See *337 Estate of Harris Fahnestock, 2 T.C. 756, and cases cited therein. We have frequently reviewed determinations made by respondent pursuant to section 23(k)(1). Respondent's determination of taxpayer's financial conditions under section 22(b)(9) are no less reviewable. If found to be in abuse of his discretion they may be upset. The evidence here impels the conclusion that petitioner was in an unsound financial condition both before and after the two dates upon which it purchased its bonds and that respondent abused his discretion in holding to the contrary. At all times here material petitioner had first mortgage bonds outstanding in an amount of not less than $950,500 against property having a fair market value of about $375,000. It had issued an outstanding capital stock of the par value of $1,140.000. Its current liabilities on July 24, 1939, totaled approximately $46,000, and on October 31, 1939, approximately $58,000. On these two dates its quick assets consisted of cash of $2,744.22 and $4,517.50, respectively. Petitioner had no valuable assets other than those mentioned. A small investment and loan receivable were worthless and the balance sheet *338 asset of "own bonds purchased" could scarcely be deemed an asset with which liabilities could be reduced. Furthermore, petitioner had no income in October and November 1939 and from May 27, 1939 it had knowledge that rental payments from the United States, the sole source of its income since its inception, would cease as of August 31, 1939. These facts, in our opinion, support our conclusion. Southeastern Building Corporation, supra.Cf. Twin City Rapid Transit Co., 3 T.C. 475. On this issue we sustain petitioner. At the hearing respondent offered, over petitioner's objection, a 30-day letter pertaining to petitioner's asserted 1937 and 1938 tax liability, together with a protest with supporting documents. The purpose of such offer was to introduce into evidence one of the supporting documents, a letter giving an opinion of the value of petitioner's building. The exhibit was admitted subject to a reserved ruling on its competency. We now conclude that such evidence was incompetent as proof of the value of the building in question; that it would be competent only for impeachment purposes. Since the author of the letter *339 was not a witness in this proceeding, there was here no one to impeach. Consequently, petitioner's objection is sustained and the exhibit is ruled inadmissible. It, of course, has not been considered for any purpose. Decisions will be entered under Rule 50.