**Amor W. SHARP, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Katherine C. SHARP, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

Nos. 12283, 12284.

United States Court of Appeals Sixth Circuit.

Aug. 19, 1955.

---

Harold D. Cohen, Washington, D. C., Vernon C. Kohlhaas, Michael Waris, Jr., Garrett S. Claypool, Washington, D. C., on the brief, Pierson & Ball, Washington, D. C., of counsel, for petitioner.

H. Brian Holland, Ellis N. Slack, David O. Walter, Dept. of Justice, Washington, D. C., for respondent.

Before SIMONS, Chief Judge, and McALLISTER and MILLER, Circuit Judges.

MILLER, Circuit Judge.

The petitioners, Amor W. Sharp and his wife, Katherine C. Sharp, seek reviews of rulings of the Tax Court adjudging deficiencies in income tax for the taxable year 1945 in the respective amounts of $32,395.80 and $7,352.43.

The material facts which are undisputed are as follows: Petitioners, who lived in Columbus, Ohio, formed a partnership in 1922 under the trade name of Columbus Wood Preserving Company. The business of the partnership consisted in procuring untreated timber products, such as piling and ties, having them treated by subcontractor treating plants under the partnership's specifications and supervision, and then shipping them to purchasers. It kept its books and reported its income on an accrual basis. In each of the years 1942, 1943 and 1944 it valued its inventory on the basis of the lower of cost or market, as it had elected to do on its returns. It valued its inventory as of December 31, 1945 on the same basis, the correctness of which under the particular facts of this case presents the issue involved.

On May 26, 1945, the partnership entered into a written agreement with the Central Procuring Agency of the War Department, hereinafter referred to as the Government, in which the partnership undertook to furnish the Government with certain piling to be used principally for harbor work in constructing piers and docks in the South Pacific. It required the partnership to furnish the Government with 18,050 pieces of un-

treated piling of varying specified lengths, to treat that piling in accordance with certain specifications, and to make deliveries in accordance with an agreed schedule of delivery. The contract provided that performance of work could be terminated by the Government in accordance with Article 20 whenever the contracting officer determined such termination was for the best interest of the Government.

Paragraph (b) of Article 20 provided that after receipt of a notice of termination the partnership was required to (1) terminate work as specified in the notice; (2) place no further orders or subcontracts unless necessary for completion of unterminated work; (3) terminate all orders and subcontracts related to the performance of terminated work; (4) assign to the Government, in the manner and to the extent directed by the contracting officer, all rights under terminated orders or subcontracts; (5) settle all claims arising out of termination of orders and subcontracts with the approval of the contracting officer to the extent that he might require; (6) transfer title and deliver to the Government as directed by the contracting officer work in process, completed work, supplies and other material acquired in respect of the performance of the terminated work; (7) use its best efforts to sell as directed or authorized the property referred to immediately above; (8) complete performance of unterminated work; and (9) to take such action as necessary, or as the contracting officer directed, for protection and preservation of the property which was in the possession of the partnership and in which the Government had or might acquire an interest.

Paragraph (c) of Article 20 provided that in the event the partnership and the contracting officer agreed upon the amount to be paid to the partnership by reason of the termination of the work the Government would pay such agreed amounts.

Paragraph (d) of Article 20 provided that in the event the parties failed to agree upon an amount under Paragraph (c), the Government would pay the partnership according to a formula specified therein, which with respect to terminated contract work included the cost of settling and paying claims arising out of the termination of work under subcontracts or orders.

Following the making of the contract the partnership executed subcontracts with suppliers of raw piling and with a number of treating plants for the processing of the piling under the Government's specifications.

Upon cessation of hostilities with Japan, the Government, on August 15, 1945, sent a telegram ordering the partnership to immediately stop all work and terminate all subcontracts. The partnership immediately sent telegrams to its subcontractors ordering them to stop all work except unloading until further advised. On August 20, 1945, the Government notified the partnership that payment for certain items would be made at the contract price under certain conditions, that cut piling which was untreated because of the contract termination was to be disposed of by the partnership without cost to the Government, or, if that was not possible, to be handled in accordance with the provisions of Paragraph (b) (9) of Article 20, and requested that if the partnership had no termination claims against the Government, or if it wished to waive such claims, it execute a form of contract enclosed and described as a "No-Cost Prime Contract Settlement Agreement." The partnership considered the Government proposal to waive termination claims but did not execute the no-cost settlement agreement.

Thereafter, the suppliers of raw piling sent the partnership their invoices for the piling which it had manufactured for delivery under their contracts. In October 1945, the partnership effected settlements with all but three of these suppliers paying them 10 cents per lineal foot for the piling which was left over. These settlements were not sales on the open market. The market for such pil-

ing was glutted at that time and no one was able to dispose of such material. The partnership was not able to effect settlement with the remaining three suppliers. The untreated piling which had been manufactured by these producers had a cost basis of $73,073.

From August 15, 1945 until March 1946 the partnership contacted every possible user in the country of whom they knew, that might be interested in using all or any part of that piling at any price, but found the market virtually extinguished. An offer was received on March 12, 1946 for a small amount at 9 cents per lineal foot.

The partnership was uncertain throughout the period between August 15 and December 31, 1945 as to its rights and obligations arising from the termination of the contract. In September 1945, a representative of the Contract Termination Branch of the Government came to Columbus to discuss the possibilities arising out of a settlement. This representative recognized the difficulties of deciding what should properly be done with the inventory. The partnership requested that he give it instructions or suggestions for the disposal of the inventory but he did not do so. The partners, although asserting their best efforts to dispose of the piling, were unable to get any results by the end of December 1945, at which time they were convinced that the possibility of disposing of such inventory was remote and that they would sustain a loss thereon.

On March 21, 1946, the partnership and the Government entered into a no-cost settlement agreement. Under this settlement the partnership transferred to the Government all its right, title and interest in and to its subcontracts with the remaining three suppliers. The Government accepted the transfer and assumed and undertook to settle with these subcontractors, such liability to the Government, however, not to exceed $25,000. The partnership released the Government of any claims against it and the Government released the partnership of all obligation to negotiate and settle with the subcontractors.

In its income tax return for 1945 the partnership accrued as an expense the $73,073, which was the cost basis of the piling manufactured by the three suppliers with whom it had not effected a settlement. It also included this piling as a part of its closing inventory at a valuation of $25,824.94 which was arrived at by using a figure of approximately 10 cents per lineal foot used in the settlements with several other suppliers. In an amended petition in the Tax Court the petitioners asserted that the market value of that inventory on December 31, 1945 was zero.

In its income tax return for 1946, the partnership by reason of the settlement with the Government, included in income the amount of $47,248.06, which was equivalent to the amount by which its closing inventory for 1945 had been written down, prior to and in the absence of any settlement with the Government. The Commissioner ruled that the partnership was, by reason of the termination provisions of the contract, precluded from valuing its 1945 closing inventory at the market value of $25,824.94 instead of $73,073.00. He removed the $47,248.06 from the income of the partnership for 1946 and added it to its income for 1945. It was this action of the Commissioner which resulted in the deficiency assessments against the partners for 1945, of which they sought review by petitions in the Tax Court.

The Tax Court held that the partnership was correct in treating as an accrued liability in 1945 the purchase price of the piling in the amount of $73,073, bought from the three contractors with whom the partnership had not made a settlement. It pointed out that this was a liability in an amount certain arising out of transactions completed during 1945; that the piling was the property of the partnership rather than the property of the Government; that although the partnership was obligated under the contract to transfer and assign its in-

terest in the piling to the Government if called upon so to do, such a transfer of title to the Government was not effective until the assignment was actually made; and that accordingly the partnership acted properly in including the piling in its inventory at the close of 1945. The parties appear to be in accord with this ruling on that phase of the case. We concur. United States v. Anderson, 269 U.S. 422, 440–441, 46 S.Ct. 131, 70 L.Ed. 347.

However, the Tax Court also held that the partnership was not justified in devaluating such inventory as of December 31, 1945 from the cost price of $73,073 to a market value of $25,824.94, thus obtaining in that year a deductible loss which had not been realized and which actually would not be realized at any time in the future. It pointed out that the contract with the Government gave the partnership the assurance of some measure of compensation or reimbursement, which fact was to be considered in valuing its inventory for tax purposes as of December 31, 1945. It accordingly sustained the Commissioner's action in disallowing the write down in value of the piling in question, thus increasing the gross income in 1945 by the amount of the devaluation.

It should be noted at the outset that this is not a case of avoidance of income tax. The factual situation was not prepared or built up by the taxpayer. The events forming the basis of the tax occurred in the regular course of the taxpayer's business. It is purely a legal question of whether the income in question is taxable in 1945 or in 1946. Established tax principles will therefore control.

■  It is settled law and so recognized by the parties that in the case of a taxpayer on the accrual basis inventories at the beginning and end of each taxable year must be taken into account if income for the taxable year is to be computed and returned. Lucas v. Kansas City Structural Steel Co., 281 U.S. 264, 268, 50 S.Ct. 263, 74 L.Ed. 848. Nor does the Government contend otherwise that under ordinary conditions the partnership, having elected to use the lower of cost or market in years prior to 1945, was also required to use that basis for the year 1945. The Government contends, however, that the income tax law is concerned only with realized losses which, in order to be deductible, must be evidenced by completed transactions fixed by identifiable events. Lucas v. American Code Co., 280 U.S. 445, 449, 50 S.Ct. 202, 74 L.Ed. 538; Brown v. Helvering, 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725; Dixie Pine Co. v. Commissioner, 320 U.S. 516, 519, 64 S.Ct. 364, 88 L.Ed. 270. It argues that in view of the partnership's contract right of recoupment against the Government it had actually suffered no loss on the piling as of December 31, 1945; that the transaction was not a closed one which would determine the amount of such loss, if any, until final settlement with the Government; and that actually when the settlement was made with the Government in 1946 the partnership suffered no loss whatsoever. It contends that the taxpayer is endeavoring through the inventory procedure to convert an unrealized loss in 1945 into an actual deductible loss during that year, which is an improper result regardless of the method used to reach it. Minnesota Tea Co. v. Helvering, 302 U.S. 609, 613, 58 S.Ct. 393, 82 L.Ed. 474.

■■  The principles relied upon by the Government are fundamental ones, generally recognized. However, it is also well recognized that the method of valuing inventory at the lower of cost or market is an instance where the tax law permits the deduction of an unrealized loss, and is a recognized exception to the necessity of reflecting in income tax returns only closed transactions. The cases relied upon by the Government are not inventory cases. The income tax law is based upon annual periods of computation of taxable income, and where such annual computation involves the determination of income by the inventory method it necessarily results that unrealized or paper losses must be consid-

ered in determining the net income for any given taxable year. Security Flour Mills Co. v. Commissioner, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725; Lucas v. Kansas City Structural Steel Co., supra, 281 U.S. 264, 268, 50 S.Ct. 263, 74 L.Ed. 848.

■ The Government's contention would have merit if at the close of 1945 the claim of the partnership against the Government was a liquidated one, even though payment might be deferred until some time in 1946. Continental Tie & Lumber Co. v. United States, 286 U.S. 290, 52 S.Ct. 529, 76 L.Ed. 1111. But at the close of 1945 the claim was in a most unliquidated shape. The partnership, at the instance of the Government, was trying to dispose of the inventory without loss to the Government. The Government had submitted a No-Cost Settlement Agreement. This certainly was no admission by the Government of a willingness at that time to pay the partnership anything by reason of the cancellation of the contract. Its representative gave no assistance to the taxpayer in trying to solve the problem. At the end of 1945 it was impossible for the partnership to know what amount, if anything, it would be able to recover from the Government. Under well established accounting principles its claim against the Government was not an accrued one which could properly be included in its 1945 return. Apex Electrical Manufacturing Co., 16 T.C. 1171, affirmed, 6 Cir., 202 F.2d 151; Boston Elevated Railway Co., 16 T.C. 1084, 1106–1107, affirmed, 1 Cir., 196 F.2d 923. In our opinion, the partnership was authorized to disregard this claim in determining the inventory value of the piling on December 31, 1945, and in treating it as income in 1946 when it was finally liquidated through the settlement with the Government. These views are in accordance with the ruling of the U. S. Supreme Court in U. S. Cartridge Co. v. United States, 284 U.S. 511, 52 S.Ct. 243, 76 L. Ed. 431, which we consider as controlling of our decision herein. See also American Propeller & Mfg. Co. v. United States, 14 F.Supp. 168, 83 Ct.Cl. 100, reversed in part on other grounds, 300 U.S. 475, 57 S.Ct. 521, 81 L.Ed. 751.

The Tax Court in its ruling did not pass upon the issue of the correct market value of the piling as of December 31, 1945. On the remand of this case the parties will be afforded an opportunity of developing that issue for determination by the Tax Court by the introduction of additional evidence if so desired.

The judgments of the Tax Court are reversed and the cases are remanded for further proceedings consistent with the views expressed herein.