LOUISVILLE COOPERAGE CO., PETITIONER, *v.* COMMISSIONER OF REVENUE, RESPONDENT.

Docket No. 17478. Promulgated January 7, 1930.

*Elwood Hamilton, Esq.*, and *H. H. Graham, Esq.*, for the petitioner.

*A. H. Fast, Esq.*, for the respondent.

664

TRAMMELL: The only matter in controversy is the value of the petitioner's inventory at December 31, 1920, it being conceded that the petitioner's method of taking the inventory at cost or market, whichever was lower, was correct. The petitioner contends that the amount of the inventory at December 31, 1920, as shown in its original return was in excess of its actual market value at that time and that the amount shown in the amended return properly represents the market value. The reduction contended for by the petitioner does not result from a revision of its entire inventory but from a revision of the items set out in our findings of fact. The respondent contends that no change should be made in the value of the inventory as reported in the original return.

The petitioner contends that there was no market for its product at December 31, 1920, and in support thereof relies on the testimony of its president and two other witnesses to that effect. One of the witnesses, G. I. Fraser, a manufacturer and dealer in tight barrel staves and heading, testified that sales were made well up through 1920, and some sales were being made on December 31, 1920, although

at that time there was a wide difference of opinion as to the market, as many contracts were being canceled. The other witness, G. P. Nervig, while testifying to the market being in a demoralized condition and contracts being canceled, also stated that the company of which he was president and which dealt in cooperage material, including staves and heading, had quite a few sales about December 31, 1920. White testified that the petitioner bought raw material— staves and heading—on the market all during the year. While according to the evidence there was a substantial slackening toward the end of 1920 in the petitioner's sales of barrels and kegs, its sales of those classes of circled heading regularly sold during the year were greater in December, 1920, than in any other month of the year. In view of the foregoing, we are not convinced by the preponderance of the evidence that there was no market on December 31, 1920, for the petitioner's products.

In support of the revised values placed on the various items of inventory here involved, the petitioner also submitted the testimony of Fraser and Nervig. Fraser, after stating that from November 1, 1920, to December 31, 1920, there was a decline of from 30 per cent to 60 per cent in the market value of staves, heading and finished barrels as shown by sales when made, stated that his company had inventoried staves at $40 per thousand at December 31, 1920, and one particular lot which was " kept track of " brought less than $20 when sold in 1921. He also stated that the season of his company ended with staves being sold for $18 to $20 per thousand which had been inventoried at $40 per thousand. With respect to W. O. oil heading, he presumed that this kind of heading selling at $1 a set at the end of 1920 sold during the first six months of 1921 at an average of not more than 38 or 40 cents a set. Nervig stated that his company inventoried " mill run " W. O. and C. O. oil staves at $60 per thousand at December 31, 1920, and, based on actual sales and purchases made by the company during the first six months of 1921, the market value of the staves had depreciated more than 40 per cent. Nervig also stated that his company inventoried circled R. O. heading at 75 cents a set and circled W. O. heading at 80 cents a set, and the average of the company's sales and purchases for the first six months of 1921 was 32.9 cents a set for R. O. heading and 34 cents a set for W. O. His idea was that the market value of rough heading was about 15 cents a set less than circled heading. While it is not clear at what time in 1921 Fraser's company ended its season by selling staves at $18 to $20 per thousand, the remainder of his testimony and that of Nervig is based on the prices existing over the first six months of 1921.

White, the petitioner's president, priced the items used in both the original and the revised inventories. He stated that the prices used

in the original inventory were based on prices being quoted to the petitioner, what the petitioner was trying to sell its product for, on his experience in the business and best judgment. He also stated that at that time the petitioner was "getting quotations from most everyone and that they were trying to unload; that they were trying to get rid of their stock." He further stated that the petitioner got information daily throughout the year as to market price when trying to buy or trying to sell. White was unable to state when he began revising the original inventory, except that it was at some time prior to the filing of the amended revurn. On direct examination White was asked twice why he did not correct the petitioner's inventory at the time the original return was filed on March 15, 1921, and a part of his answer each time was that he did not know it was too high at that time. With respect to the revised inventory he stated that the values used were based on information obtained in the same way as for the original inventory and that in the meantime the petitioner had had a number of sales so that he could determine what the value was. Other than indicating that these sales were made some time between December 31, 1920, and September, 1922, the record does not show when they were made.

Considering all the evidence in the case, we do not think that what transpired over a period ranging from the first six months of 1921 when the market was declining to September, 1922, affords the proper basis for determining what the market value of the inventory was on December 31, 1920. In *Neusteter Suit Co. et al.*, 8 B. T. A. 477, where we were considering the market value of inventories, we said:

That "market value" for inventory purposes generally means the replacement cost to the taxpayer or the price at which the taxpayer may replace the particular goods by purchase in the open market is not disputed.

The petitioner has introduced much testimony as to sales made by itself and others subsequent to December 31, 1920, but nothing as to replacement costs on December 31, 1920, or the prices at which Fraser and Nervig's companies were making sales at about that date. It is the market value on December 31, 1920, that we are concerned with and not what selling prices were over a period of from six to twenty months thereafter. The values testified to by the witnesses are arrived at from a consideration of the selling prices over a period during a substantial portion of which there was a falling market. During a period of declining prices it is entirely possible that the market value of an article on a particular date might be considerably more than it could be sold for a few weeks or months thereafter. We think that is very much the situation in the case before us. The petitioner's president, who priced

both the inventories, had long experience in the cooperage business and seems to have been well informed on December 31, 1920, as to market conditions and the prices at which the inventoried articles were being offered for sale by others. The only information he had before him when making the revised inventory that he did not have when he priced the original inventory was purchases and sales made subsequent to December 31, 1920. This information must have been obtained subsequent to March 15, 1921, as at that time he did not know that the inventory was too high.

Considering all the evidence in the case, we are of the opinion that the revised inventories reflect the decline in market value after December 31, 1920, rather than the market value on that date. We are, therefore, unable to find that the respondent erred in refusing to accept them instead of the original inventories.

*Judgment will be entered for the respondent.*