National Fireworks, Inc., and Affiliated Corporations v. Commissioner.
National Fireworks, Inc. v. Commissioner
Docket No. 25481.
United States Tax Court
T.C. Memo 1956-1; 1956 Tax Ct. Memo LEXIS 293; 15 T.C.M. (CCH) 1; T.C.M. (RIA) 56001; January 10, 1956
*293 Valuation of inventories: Cost v. market: Year of loss of value. - Taxpayer, a parent corporation and its subsidiaries, alleged that the closing inventory of one subsidiary was inadvertently overstated and overvalued on its consolidated return, resulting in overstatement of income. The taxpayer claimed that the subsidiary always valued its inventory at the lower of cost or market and that cost figures, rather than the lower market figures, were inadvertently used. The Tax Court held that the closing inventory could not be valued at market value as the taxpayer failed to show that the opening inventory was valued at the lower of cost or market. Furthermore, the Court held that taxpayer failed to prove that the market value was lower than cost and that, even if some inventory was disposed of as scrap or sold at a loss in a later year, it must be included in the closing inventory at cost, the loss to be taken in the year the inventory was actually scrapped or sold. Business deductions: Year deductible: Reserve for estimated expense to rework finished goods. - In its cost of goods sold, taxpayer included "provision for loss of finished goods on proofing tests". The Court held that, *294 since neither the liability for the provision nor the obligation to perform the rework had accrued in the taxable year, the "provision" could not be included in the cost of goods sold during the tax year involved. George F. Smith, Jr., Esq., 824 Connecticut Avenue, N.W., Washington, D.C., for the petitioner. Joseph Landis, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined a deficiency in excess profits tax for the fiscal year ended August 31, 1943, in the amount of $1,203,439.85. Part of the deficiency is contested. There are two issues for decision, as follows: (1) Whether, in the instance of a subsidiary, Automatic Machinery Manufacturing Corporation, Automatic's closing inventory at December 22, 1942, as *295 used to determine its cost of goods sold, was overstated in the amount of $703,642.94. (2) Whether National Fireworks, Inc., is entitled to include in cost of goods sold, in computing the consolidated income of the group for the taxable year, the amount of $263,911.36, which represents an estimate of the cost of reworking finished goods on hand at the end of the taxable year which might be rejected in proofing tests to be made, which would be made after the close of the taxable year. The petitioner has abandoned one issue. Another issue has been settled by the parties. Some of the determinations of the Commissioner are not contested. Findings of Fact The stipulated facts are found as stipulated. The stipulation is incorporated herein by this reference. The petitioner is a member of, and the parent corporation of, a group of affiliated corporations. It was entitled to file, and did file, consolidated corporation income tax and excess profits tax returns for the fiscal year beginning on September 1, 1942 and ending on August 31, 1943. The petitioner filed its returns with the collector for the district of Massachusetts. The returns were signed by George J. Clark, President, and *296 Francis Barrett, Treasurer. Petitioner kept its books on an accrual basis and filed its returns on the basis of a fiscal year beginning on September 1, and ending on August 31, except as to members entering or leaving the affiliated group during the year, in which case, that portion of the income for the fiscal period of such member which the number of days of affiliation bore to the number of days of the fiscal period was included in income. Petitioner, during the period involved, was an affiliated group of corporations consisting of a common parent, National Fireworks, Inc., hereinafter referred to as Fireworks, and the following other includible corporations: National Foundry, Inc. Southern New England Supply Co. American Fireworks Co. of Mass.
Peerless Tools, Inc. Babbitt Industrial Specialties Co. (Successor to Namco, Inc.) Poland Spring Company California Fireworks Co. Ltd. Victory Fireworks & Specialty Co.
Automatic Machinery Mfg. Corp. Pacific Iron Works, Inc. National Hanover Corp. Hiram Ricker & Sons Issue 1: All of the stock of Automatic Machinery Manufacturing Corp., hereinafter referred to as Automatic, was acquired by Fireworks, on July 31, 1942, and *297 was sold on December 22, 1942. The receipts, cost of goods sold, deductions, and net income of Automatic and its subsidiaries were determined for the period September 1, 1942 to December 31, 1942, and the books of said companies were not closed as of December 22, 1942. From the income determined for such period (September 1, 1942 to December 31, 1942) there was eliminated 9 (the number of days from December 22 through December 31) / 122 (the number of days from September 1 through December 31) and the balance was included in the consolidated net income reported in petitioner's consolidated corporation income and excess profits tax returns for its taxable year ended August 31, 1943. On petitioner's consolidated income tax return for the taxable year ended August 31, 1943, the net sales, cost of goods sold and gross profit of Automatic were shown as $549,826.12, $570,785.38, and ($20,959.26) (loss), respectively. The determination of Automatic's cost of goods sold, $570,785.38, was shown on the return as follows: Inventory at beginning of year
$1,393,269.84
Material or merchandise bought
for manufacture or sale
309,781.74
Salaries and wages
418,988.54
Other costs per books: Development expenses
6,800.00
Insurance
9,265.41
Fuel, water, power and light
6,127.65 lStationery, printing and post-
age
1,855.40
Traveling and entertainment
5,455.62
Miscellaneous supplies, etc.
20,140.54
Telephone and telegraph
2,820.33
Sundry (net)
(3,126.92)
Total
$2,171,378.15
Less inventory at end of year
1,600,592.77
Cost of goods sold
$ 570,785.38
*298 Automatic's inventory at December 31, 1942, as used to calculate its cost of goods sold on the consolidated return filed by petitioner, was $1,600,592.77, consisting of items as follows: 38 U-E Profile Milling Machines
$ 55,125.72
12 E-25 Double Spindle Profiles
99,239.40
P10 and P12 Shaper Planers
54,737.56
U-6 Hob Thread Millers
166,242.79
Miscellaneous Parts, etc.
61,930.78
Collier Multiple Purpose Machine
438,277.66
Frankel Multiple Purpose Lathe
191,706.59
Hydraulic Spline Millers
92,921.63
LE-1 Lathes
59,494.03
SG-2-B Surface Grinders
99,242.02
P S Sonitra Machines
7,135.75
Total
$1,326,053.93
Raw materials
274,538.84
$1,600,592.77
At some time in 1940 the then Executive Vice-President of Fireworks talked with a Mr. Collier and a Mr. Lorey with respect to a machine said to have been invented by Collier for the manufacture of armor-piercing cores. Fireworks decided to explore the Collier machine and in 1940 advanced about $20,000 to Collier. Automatic was located in Bridgeport, Connecticut, where it had a large plant engaged in the manufacture and assembling of machine tools. Seaboard Commercial Corporation, hereinafter referred *299 to as Seaboard, was a financial institution which made advances to manufacturers who needed financing. In late 1940 or early 1941, Collier arranged with Automatic for Automatic to build for Collier 100 machines. The manufacture of these machines was to be financed by a loan from Seaboard to Collier, and Fireworks guaranteed the loan up to $100,000. In early 1941 Automatic reported that the machine as submitted by Collier was of no commercial value and had to be redesigned. The redesigning work went on through 1941. The Collier machine was originally conceived as a multiple purpose machine suitable for threading, cutting and drilling. Prior to June of 1942 the design was changed and by July of 1942 the machine was designed to be a bullet-making machine. In the spring of 1942, letters of intent for the purchase of 815 of the Collier machines for $2,200 each were received by Automatic from the Philadelphia Ordnance District. When Automatic received letters of intent with respect to Collier machines it proceeded to undertake the manufacture of those machines. By July of 1942, Fireworks had become completely dissatisfied with the management of Automatic. About the 22nd of July *300 1942, negotiations were entered into for the purchase of all of the capital stock of Automatic which, at that time, was owned by its President and pledged as collateral as a loan for Seaboard. On July 31, 1942, Fireworks paid Automatic's President, $100,000 for all of the stock, Automatic's President paid off the Seaboard loan and the stock was delivered to Fireworks. At this time, commitments had been made for materials to complete 815 Collier machines. The first 100 machines were pretty well along in process. In the latter part of August 1942, Automatic had been advised by the Philadelphia Ordnance District to stop production of the Collier machine. In September 1942, an effort was made to have the stop order rescinded without avail, but the Philadelphia Ordnance District did ask for a thirty-day test running the machines twenty-four hours a day. The tests were actually run from the latter part of September until the latter part of October. Some difficulty was encountered in the tests. The stop order was apparently issued because there was a decrease in demand for bullet cores and also because there was some question as to the soundness of the Collier machines. Thereafter, *301 Automatic was advised by the Philadelphia Ordnance District that it had no desire to go ahead with the order and was not disposed to reinstate it. Work continued on the Collier machines even after the above events. Automatic continued to try to complete 100 machines. The stop order with respect to the Collier machine put a damper on its prospects, but only to a certain extent - not entirely. No part of the inventory of Collier machines on hand was actually sold for scrap on or before December 22, 1942. The assemblies and subassemblies of Collier machines had not deteriorated physically. A fairly substantial amount of money was spent on the Collier machines by Automatic's successor corporation after December 31, 1942. As a result of the stop order, Automatic had a claim under the letters of intent for the amount of such expenditures as labor, materials, and overhead, which had been made up to the effective date of the stop order. Such a claim was made by Automatic after December 1942, with respect to the Collier machines. Automatic's claim with respect to the cancellation of the Collier machine orders amounted to some $570,000. The claim was settled in May 1943. The settlement *302 comprehended the delivery of 96 machines and took into consideration the factors of expenses incurred up to the date of the stop order and the confusion engendered by the stop order and the thirty-day test run. When Fireworks first acquired the stock of Automatic, there was a partly assembled surface grinder which, with some parts, was put aside where it stayed until December 22, 1942. The surface grinder was a single purpose machine for grinding rough surfaces. Surface grinders were being built for stock by Automatic; it had no orders for them. No value was added to the surface grinders, no parts, labor or overhead charges were added to the inventory of surface grinders during the entire period in which Fireworks owned the stock of Automatic. The physical value of the surface grinders was the same when Fireworks acquired the stock of Automatic and when Fireworks disposed of the stock. The Frankel lathe was a machine having a bed about 10 feet long on which were mounted four or five working heads to do different types of work, such as cutting steel bars, drilling holes, chamfering, threading, etc. The original plans for the Frankel machine were expressed in metric dimensions. *303 Automatic had orders on its books for Frankel lathes for the United States Navy. During the period September to December 1942, the Navy, which had originally indicated a desire to purchase 50 Frankel machines, indicated it was no longer interested in 50 but might be interested in 10. The Navy contract for Frankel lathes was not actually cancelled December 22, 1942. One Frankel lathe was completed and accepted after December 31, 1942. Prior to December 22, 1942, a Chicago concern approached Automatic with reference to the purchase of the parts for Frankel machines with the intention of completing the assembly of the machines. The parts for the Frankel lathe were actually sold by Automatic's successor corporation in 1943 to a Chicago concern. They were not sold as scrap but as parts for assembly of completed machines, the purchaser contemplating that he could build workable machines. The U-6 Hob Thread Milling machine was a single purpose machine. It had proven itself and there was a market for it. The inventory of U-6 Hob Thread Milling machines on December 22, 1942 included no completed machines. Automatic had firm orders for the uncompleted machines on hand at that date. *304 The orders for the U-6 Hob Thread Milling machines were from the Defense Plant Corporation under a pool order so-called, for a pool of machine tools. All of the U-6 Hob Thread Milling machines in inventory on December 22, 1942 were sold after December 31, 1942. At the time the stock of Automatic was purchased by Fireworks (July 31, 1942), a large part of Automatic's assets was unfinished inventory. On July 31, 1942, Automatic was indebted to Seaboard in an amount of approximately $1,500,000, which indebtedness had arisen out of advances made from 1939 by Seaboard to Automatic. At the time Fireworks acquired the stock of Automatic the production of Collier machines was the most active part of the work at the plant. As of August 31, 1942, the balance sheet of Automatic reflected total assets of $2,705,403.92, including, inter alia, inventories of $1,233,984.84, and fixed assets (after reserves for depreciation and amortization) of $656,806.25; total liabilities of $2,712,942.73, including, inter alia, liability for advances by finance company of $1,634,607.75; capital stock, $250,000; paid-in surplus, $207,711.66; and deficit of $465,270.47. Throughout the period July 31, 1942 to *305 December 22, 1942, Seaboard made additional advances to Automatic. Seaboard continued to make such advances to Automatic even after Automatic was notified that the orders for the Collier machines would be cancelled and after the conclusion of the thirty-day test. By December 31, 1942, Automatic was indebted to Seaboard in an amount of about $1,800,000. From August 1942 through December 31, 1942, a director of Seaboard was Treasurer of Automatic. On December 22, 1942, Fireworks sold all of the stock of Automatic which in turn owned all of the stock of Peerless Tools, Inc. and Pacific Iron Works, Incorporated, to Bolton Manufacturing Company (Connecticut) hereinafter referred to as Connecticut, a wholly-owned subsidiary of Seaboard. A new corporation, Bolton Manufacturing Company (Delaware) hereinafter referred to as Delaware, was organized in December 1942, and after December 22, 1942, acquired all the assets, including the capital stock of Automatic, and assumed all the liabilities of Connecticut in exchange for Delaware's voting stock. Connecticut was liquidated and dissolved on or about December 31, 1942 and distributed to its parent, Seaboard, all the capital stock of Delaware. *306 On December 31, 1942, Automatic was merged into Delaware. On the consolidated income tax return of Fireworks and its subsidiaries for the taxable year ended August 31, 1943, Automatic reported a net loss of $208,650.02, of which $193,257.82 was taken as the portion allocable to the period for which Fireworks owned the stock of Automatic. Fireworks sold the stock of Automatic, which had cost $100,000, for $10,000 and after adjustment of basis for losses of the subsidiary (Automatic) included in the consolidation, the consolidated return of petitioner for the taxable year ended August 31, 1943 showed a gain on the sale of $10,000. Daniel Needham was a Director, General Counsel, and Clerk of Fireworks, and a Director and Counsel of Automatic. What Needham knew of the affairs of Automatic had entirely to do with conferences, meetings, and discussions of the operating personnel of the plant. He had nothing to do with the books of the corporation. Needham was an officer and Director of Fireworks when its income and excess profits tax returns for the taxable year ended August 31, 1943 were filed. He did not examine the returns nor the Profit and Loss Statements which were schedules *307 of the returns, he was not aware of the ending inventory figures of Automatic used in the consolidated returns and was not consulted by the individuals who prepared the returns as to the value of the Automatic inventory. C. William Wannen, a Director and the General Manager of Automatic, never told the President and Treasurer of Fireworks his opinion of the value of the inventory items, Collier machines, surface grinders, Frankel lathes, and U-6 Hob Thread Milling machines. Wannen never recommended to his immediate superior that the enumerated inventory items be disposed of on a salvage basis. Henry S. Elder was Treasurer of Automatic from August 1, 1942 through December 31, 1942. Prior to becoming Treasurer of Automatic, Elder was Secretary-Treasurer of Seaboard Commercial Corporation. Elder was a Director of Seaboard while he was Treasurer of Automatic. Elder never reported his opinion of the value of items in Automatic's inventory to the President or Treasurer of Fireworks. Elder was not consulted in respect to the preparation of the consolidated income and excess profits tax returns of Fireworks and its subsidiaries for the 1943 taxable year. George J. Thomas, an *308 expediter at the Automatic plant never expressed to the President and Treasurer of Fireworks his opinion of the inventory values. Prior to April 1, 1942, Automatic filed its returns for fiscal years ending March 31. For its fiscal year ended March 31, 1942, Automatic filed corporation income and declared value excess profits tax and corporation excess profits tax return. The income and deductions of Automatic for the period April 1, 1942 to August 31, 1942, were included in the consolidated corporation income tax and corporation excess profits tax returns of petitioner for its taxable year ended August 31, 1942. Upon examination of said returns by the Bureau of Internal Revenue, there was eliminated from the consolidated net income 122 (the number of days from 4/1 through 7/31) / 153 (the number of days from 4/1 through 8/31) of the income of Automatic. The cost, physical condition and market value of the surface grinders in Automatic's inventory on December 31, 1942 remained the same at all times for the period July 31, 1942 through December 31, 1942. On December 31, 1942, the values of the U-6 Hob Thread Millers, Collier Multiple Purpose machines and Frankel Multiple Purpose *309 lathes in Automatic's inventory were not less than $166,242.79, $438,277.66, and $191,706.59, respectively. For the period September 1, 1942 through December 31, 1942, Automatic's cost of goods sold was not more than $570,785.38. Issue 2. Included in Fireworks cost of goods sold used in determining gross income included in petitioner's return for the taxable year ended August 31, 1943, was an amount of $263,911.36, designated "Provision for loss of finished goods on proofing tests." The said amount represented a reserve for the cost of reworking finished goods on hand at August 31, 1943 which it was anticipated would be rejected in proofing tests. As of the end of the 1942 taxable year, Fireworks had such a reserve of approximately $230,000 in respect of its finished goods inventory on that date. Costs actually incurred during the taxable year 1943 as a result of proofing tests of finished goods on hand at the end of the previous taxable year were charged to direct or manufacturing expenses and not to the reserve. Costs actually incurred subsequent to the taxable year 1943 as a result of proofing tests of finished goods on hand as of the end of the taxable year 1943, were *310 charged to manufacturing expense in the year incurred and not against the reserve. The charging of such costs reduced the income of the year in which they were charged. In a taxable year subsequent to 1943, the balance of the reserve account was credited to income by petitioner. Opinion The first question to be decided is whether Automatic, one of petitioner's subsidiaries, overstated its closing inventory, as of December 31, 1942, in the amount of $703,642.94, or in any other amount, in the computation of its cost of goods sold. The second issue to be decided is whether petitioner properly included in the determination of its cost of goods sold for the taxable year ending August 31, 1943, the sum of $263,911.36, which was an estimate of the cost of reworking finished goods then on hand which in subsequent taxable years might fail to pass proofing tests. Issue 1. Petitioner filed a consolidated income tax return for the taxable year September 1, 1942 through August 31, 1943. For a part of that period, by reason of the purchase by Fireworks of all of its capital stock, Automatic was a member of the consolidated group. In the consolidated return there was included in consolidated *311 net income the proportionate part of the income of Automatic for that part of the period September 1, 1942 through December 31, 1942, during which Automatic was a member of the consolidation. In the determination of Automatic's income for that period the ending inventory value used was $1,600,592.77, which included, inter alia, items designated as follows: U-6 Hob Thread Millers, Collier Multiple Purpose Machines, Frankel Multiple Purpose Lathe, SG-2B Surface Grinders The question of value of Automatic's closing inventory at December 22, 1942 was raised for the first time in the first amendment of the petition, in which it was alleged that the closing inventory was overvalued by $460,000. In the second amendment of the petition, petitioner alleged that the overvaluation was in the amount of $740,000. On brief, the petitioner contends that the overvaluation was in the amount of $703,642.94. The petitioner presented evidence to establish the value of the aforestated four items of inventory. The petitioner contends that the alleged overstatement resulted in overstatement of income for the taxable year in the amount of $703,642.94. The petitioner cites United States Cartridge Co. v. United States, 284 U.S. 511; *312 Burroughs Adding Machine Co., 9 B.T.A. 938; and American Propeller and Mfg. Co. v. United States, 14 Fed. Supp. 168. The petitioner's claim, in effect, is that Automatic always valued its inventory at the lower of cost or market; that on December 31, 1942, the market value of the four items in question was substantially lower than Automatic's cost; that through inadvertence, the cost figures, rather than the lower market value figures, were used in the computation of Automatic's closing inventory, as of December 31, 1942; and that petitioner is now entitled to claim the lower market value, in order that Automatic's return will conform to its customary method of valuing inventory at the lower of cost or market value. With respect to the possibility that the four items were equally overvalued in Automatic's opening inventory, petitioner's position is that only Automatic's closing inventory has been placed in issue by the pleadings and that issues relating to the opening inventory cannot be considered by the Court. Petitioner relies on Western Wheeled Scraper Co., 14 B.T.A. 496. The petitioner's position cannot be sustained. In the first place, *313 there is no evidence whatever as to the basis on which Automatic's opening inventory was valued. This evidence is essential, not because the respondent seeks to adjust the figures reported for opening inventory, but because the closing inventory must be valued by the same method as was used in valuing the opening inventory. It is fundamental that the taxpayer's method of valuing inventory must be consistent. W. W. Guy, Administrator, 13 B.T.A. 51, 55, affd. 35 Fed. (2d) 139. See, also, Eatonville Lumber Co., 10 B.T.A. 232, 235; Regs. 111, Sec. 29.22 (c)-2. The petitioner has not shown that Automatic's opening inventory was valued at the lower of cost or market, and without such a showing, the necessity for consistency requires that the closing inventory cannot be valued by such method. In these circumstances, the language of the Circuit Court of Appeals in Guy v. Commissioner, 35 Fed. (2d) 139, 141 is particularly apposite: "The correctness of the board's refusal to permit the taxpayer to revalue the merchandise of the firm is further supported by the failure of the taxpayer to show the basis upon which the inventory for its fiscal *314 year was computed. Section 203 of the Revenue Act of 1918 provides that inventories shall be taken by a taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as confirming to the best accounting practice. Sections 1581 and 1582 of Treasury Reglations 45 require that inventories must be valued either at cost price or at cost or market price, whichever is lower, and that whichever basis is adopted must be applied consistently to the entire inventory. It is obvious that, unless this regulation is followed, the taxable income of a business cannot be ascertained. The evidence fails to show that the inventory compiled by the taxpayer at the beginning of the taxable year ending June 30, 1920, was computed on the basis of market price as distinguished from the basis of cost. It follows that on this ground alone the decision of the Board of Tax Appeals was correct." The petitioner cannot prevail for the additional reason that it has not established that the four items had a market value of $703,642.94 less than the amounts set forth in the computation of Automatic's cost of goods sold. The market value of the items on December 31, 1942 is a question *315 of fact. Upon careful consideration of all of the evidence, it must be concluded that the petitioner has failed in its burden of proof. The evidence adduced by the petitioner does not establish that the value of the four items which it contends were overvalued, i.e., surface grinders, U-6 Hob Thread millers, Frankel lathes, and Collier machines, was less than the value used in the return. Petitioner's evidence has not brought these items within the provisions of section 29.22(c)-2 of Regulations 111, with respect to unsalable merchandise, for there is no showing that any of the items in question were actually offered for sale within thirty days of the inventory date. By the same token, the items in question do not fall within the provisions of section 29.22(c)-4 of the Regulations where no open market exists. All of petitioner's witnesses expressed opinions that the four items in question were worth, on December 31, 1942, no more than scrap value. Not one of the items in question was actually disposed of as scrap either before or after December 31, 1942. Even if they had been disposed of as scrap after December 31, 1942, they would still be required to be included in inventory *316 at cost on that date, and the loss taken in the year in which they were scrapped. American Manganese Steel Company, 7 B.T.A. 659. The testimony of petitioner's witnesses not only fails to establish that the values of the Automatic inventory on December 31, 1942, used in the return was overstated, but there is evidence which tends to show that the value was not overstated, as follows: Notwithstanding all of the dire events which the witnesses testified affected adversely the value of the inventory, Seaboard, a director of which was the treasurer of Automatic, continued to make advances to Automatic for the completion of items in process until the disposition of the Automatic stock by Fireworks on December 22, 1942. At that date a subsidiary of Seaboard paid Fireworks $10,000 for the stock of Automatic. While there is no direct evidence of the book value of the Automatic stock on that date, it is a fact that at the date Automatic was indebted to Seaboard in an amount of $1,800,000. The balance sheet of Automatic on August 31, 1942, shows that it was at that time a deficit corporation, that is to say, that the accumulated deficit exceeded the equity of the stockholders. *317 In the period from September 1, 1942 to December 31, 1942, an operating loss of $263,911.36 was incurred, so that by this amount the deficit was even greater. If the inventory value were the amount which petitioner contends, the deficit would be in excess of $1,000,000, and it would be exceedingly strange that Seaboard's subsidiary would pay $10,000 for the stock of Automatic. On the other hand, if the inventory of Automatic was worth the amount shown in the return as of December 31, 1942, it would not be unreasonable for Seaboard to acquire the Automatic stock, hoping to realize a gain upon the completion and disposition of that inventory at a profit. The petitioner's evidence tends to show developments subsequent to December 31, 1942. This evidence does not, however, indicate that the value of the items on December 31, 1942 was less than the value shown in the closing inventory. For example, the U-6 Hob thread millers which were in inventory on December 31, 1942 were all sold subsequently. The amount received from the sales of these machines has not been shown. If there was a loss on such sales, that fact does not afford a basis for determining market value on December 31, 1942. *318 Grays Harbor Motorship Corp. v. United States, 45 Fed. (2d) 259, certiorari denied, 284 U.S. 627; Louisville Cooperage Co., 18 B.T.A. 660, affd. 47 Fed. (2d) 599, certiorari denied, 284 U.S. 630. As to the Frankel lathes, none of which had been completed by December 31, 1942, there is testimony that one was completed and delivered at a subsequent date, and, furthermore, that the parts were sold after December 31, 1942, to a company which contemplated completing them. There is no evidence of the amount received either for the completed machine or the parts. It is concluded that a market value in respect of this item of inventory in an amount less than that used on the return has not been established. With respect to the item, Collier machines, there is a similar failure of proof of a market value in an amount which is less than the value used in the return. The testimony of petitioner's witnesses shows that even after the stop order from the Philadelphia Ordnance District was received, work was done on those machines, and that subsequent to December 31, 1942, Automatic's successor corporation expended a substantial *319 sum of money on those machines. Even if it had been shown that subsequently it developed that the cost of those machines could not be recovered upon their completion and sale, this would not establish that the amount of the market value on December 31, 1942 was less than the amount of the value used in the return. Louisville Cooperage Co., supra.Furthermore, on December 31, 1942, petitioner had a claim based upon the cancellation of the letters of intent, under which the costs of the Collier machine had been incurred, for an amount greater than the value of the machines used in the inventory. The subsequent settlement of this claim by Automatic's successor corporation, some four or five months after December 31, 1942, is not a basis for finding that the value of the machines to be used in the December 31, 1942 inventory was less than the value used in the return. Louisville Cooperage Co., supra. It is held that the inventory of Automatic used on the return was not overvalued. Issue 2. Included in Firework's cost of goods sold used in determining the consolidated income on petitioner's return for the taxable year 1943, is an amount of $263,911.36, *320 which is called "provision for loss of finished goods on proofing tests." The respondent contends that this item is not allowable in 1943 costs since liability therefor did not become fixed and certain in that year. The respondent relies upon Dixie Pine Products Co. v. Commissioner, 320 U.S. 516. The petitioner concedes that where inventories are kept on a basis of cost or cost or market, whichever is lower, no deduction with respect to any estimated expenses of completion is proper. The petitioner contends, however, that certain finished goods of Fireworks were carried in inventories at their selling price; that an offset was made in cost of goods sold for the expense of completion; and that the resulting "net inventory" was higher than cost or market, whichever is lower. The petitioner's position under this issue is that where finished goods are carried in inventory at selling price, a system of charging cost of goods sold with the estimated cost of completion represents a proper method of valuing inventories, and such charge is necessary in order clearly to reflect income. Petitioner is unable to cite any authority which supports its contention. Consideration has *321 been given to all of petitioner's argument, but we are unable to sustain the petitioner. The deduction of $263,911.46 is the amount which petitioner claims represents an estimate of the cost of reworking finished goods on hand at the end of the taxable year 1943 which might be rejected in proofing tests. There is no evidence that the finished goods on hand had even undergone, at the end of the taxable year, any proofing tests, let alone that costs of reworking such goods, or that a liability to anyone for such costs had been incurred. An alleged liability for such costs was neither fixed nor certain in the taxable year which ended on August 31, 1943. Accordingly, the estimated amount of such costs which might be incurred after August 31, 1943, may not be deducted in that taxable year. Capital Warehouse Co., Inc. v. Commissioner, 171 Fed. (2d) 395, affirming 9 T.C. 966; Edward T. Gardner, 20 T.C. 553. We agree with the respondent that allowance of the item in question would result in giving a double deduction to petitioner. Fireworks included in its 1942 costs, a similar item in an amount of some $230,000, in respect of finished goods on hand *322 at the end of that year, setting up a reserve on its books. The costs actually incurred in 1943 for reworking in 1943 finished goods rejected on proofing tests were charged to expense in 1943, and were not charged to the reserve. The charge to "provision for loss of finished goods on proofing tests" duplicates the deductions taken for the costs actually incurred in 1943. Since only the latter are deductible, Central Cuba Sugar Company v. Commissioner, 198 Fed. (2d) 214, certiorari denied, 344 U.S. 874, the Commissioner has properly disallowed the former. Petitioner contends that it included the finished goods in its ending inventory at the selling price, not cost, and that, therefore, it has included in its 1943 return the profit on such goods and, accordingly, should be allowed to offset possible future costs. It is by no means clear that petitioner did include in income for 1943 the profit on the finished goods inventory. There is testimony to the effect that both the beginning and ending inventories of finished goods were valued the same way. It does not follow that the profit on the ending inventory is included in income. But even if that were so, in *323 the absence of a showing that the obligation for any such costs had been incurred in 1943, they may not be deducted. In Spencer, White & Prentis, Inc., v. Commissioner, 144 Fed. (2d) 45, certiorari denied, 323 U.S. 780, a similar contention was rejected. In that case it was found that "The liability for the estimated deduction clearly had not accrued during the year in which the deduction was sought. The only thing which had accrued was the obligation to do the work which might result in the estimated indebtedness after the work was performed." Here, not only had the liability for the claimed estimated deduction in the amount of $263,911.46 not accrued in 1943, but, further it is not clear that even the obligation to do the work had accrued in the taxable year, since it does not appear that the finished goods had been submitted to proofing tests. It is held that the amount of the "provision for loss of finished goods on proofing tests" may not be included in Firework's cost of goods sold for the taxable year 1943. The deduction claimed is denied. Decision will be entered under Rule 50.