The Apex Electrical Manufacturing Company, an Ohio Corporation, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 27274.   Promulgated May 29, 1951.

*M. E. Newcomer, Esq.*, for the petitioner.
*Clarence E. Price, Esq.*, for the respondent.

OPINION.

Tietjens, *Judge:* The issue herein presents the primary question of whether respondent erred in including in petitioner's income for the taxable year 1944, the amount of $289,815.54 received in 1947 in final settlement of a claim arising out of the cancellation and termination, in 1942, of a subcontract for production of materials for national defense. The supplementary questions involved are whether 1944 is a proper year for accrual of that amount for tax purposes under the facts herein and whether the applicable regulation required in the inclusion of that amount in income in 1944 as determined by respondent and, if so, the validity thereof.

Under Regulations 111, section 29.42–1 respondent promulgated Mimeograph 5897, 1945 C. B. 131,[1] to prescribe rules, for other than

---

[1] Section 29.42–1 : When included in gross income.

1945–16–12108
Mim. 5897
(July 24, 1945)

  *      *      *      *      *      *

Mimeograph 5766 [C. B. 1944, 156], dated November 1, 1944, contains rules governing the treatment of compensation for the termination of fixed-price contracts which constitute war contracts within the meaning of section 3 of the Contract Settlement Act of 1944 [58 Stat., 649, 650], in cases where the contractor renders his returns other than on a basis of cash receipts and disbursements and the compensation is received pursuant to a negotiated settlement, together with rules with respect to the effect of a no-cost settlement in respect of a termination of a fixed-price contract. The method of treatment therein prescribed will continue to be followed. Pursuant to the provisions of section 29.42–1 of Regulations 111, as amended by Treasury Decision 5405 [C. B. 1944, 154], approved September 22, 1944, the provisions of Mimeograph 5766 are, however, restated in this mimeo-

cash basis taxpayers, for the treatment and inclusion in gross income of compensation for the termination of a contract which constitutes a "war contract" within the meaning of section 3 of the Contract Settlement Act of July 21, 1944. Under that portion of Mimeograph 5897 pertaining to war contracts terminated prior to July 21, 1944, and particularly under the provisions of the first paragraph of subparagraph (a) (1) respondent determined that the amount of $289,815.54 (*sic*), received in the 1947 contract termination settlement, was includible in petitioner's income for the calendar year 1944 which was the first taxable year ending after the effective date of the Contract Settlement Act.

The petitioner's subcontract with Ford was for the production of materials for national defense and there is no question herein but that it constituted a "war contract" which was "terminated" within the meaning of section 3 of the Contract Settlement Act of 1944, 58 Stat. 649 (U. S. Code Ann., Title 41, Chap. 2). That section defines the term "prime contract" as meaning "any contract, agreement, or purchase order heretofore or hereafter entered into by a contracting

graph and are supplemented to prescribe rules for the treatment of compensation for the termination of all war contracts in all cases where the contractor renders his returns other than on a basis of cash receipts and disbursements.

(a) When Compensation Included in Cross Income.—In the case of a termination of a contract which constitutes a war contract within the meaning of section 3 of the Contract Settlement Act of 1944, compensation for the termination shall be included in computing gross income for the taxable year or years determined in accordance with the following rules:

(1) Taxable Years Ending Prior to July 21, 1944.—In case a war contract is terminated within a taxable year ending prior to July 21, 1944, the effective date of the Contract Settlement Act of 1944, compensation for the termination shall be included in computing gross income for the taxable year in which the claim is allowed (or the settlement proposal is accepted), or for the taxable year in which its value is otherwise definitely determined, or for the first taxable year ending after July 20, 1944, whichever year is the earliest; provided, however, that the contractor shall not be required or permitted to include in income for such year any part of the income from the contract termination which was included in income for the taxable year of the contract termination.

The provisions of the preceding sentence are applicable in the case of negotiated settlements of fixed-price war 'contracts and in all other cases of terminations of war contracts. * * *

If at the close of the taxable year of the contract termination there is no agreement to pay to the contractor any compensation for the termination, or if the agreement to pay is conditioned upon events which have not occurred, no compensation for the contract termination shall be includible in computing gross income for such year. * * * .

(2) Taxable Years Ending on or After July 21, 1944.—In case a war contract is terminated within a taxable year ending on or after July 21, 1944, the income from the contract termination shall be included in computing gross income for the taxable year of the contract termination. * * *

(3) Adjustment of Return.—If the income from the contract termination which, under the above subparagraph (1), is to be taken into account in computing gross income for the taxable year in which the Contract Settlement Act of 1944 became effective, or which, under the above subparagraph (2), is to be taken into account for the year of the contract termination, is not definitely ascertained at the time of filing the return, the contractor shall include in his return a reasonable estimate of such income, and should attach to his return a statement identifying the contract termination to which such estimate relates. When the correct amount of such income from the contract termination is ascertained, an adjustment shall be made for the year for which such income was included. (Cf. *Continental Tie & Lumber Co.* v. *United States,* 286 U. S. 290, [Ct. D. 494, C. B. XI–1, 260 (1932)].)

agency and connected with or related to the prosecution of the war"; defines the term "subcontract" as meaning "any contract, agreement, or purchase order heretofore or hereafter entered into to perform any work, or to make or furnish any material to the extent that such work or material is required for the performance of any one or more prime contracts"; defines the term "war contract" as meaning "a prime contract or subcontract"; and defines the terms "termination," "terminate," and "terminated" as referring to "the termination or cancellation, in whole or in part, of work under a prime contract for the convenience or at the option of the Government (except for default of the prime contractor) or of work under a subcontract for any reason except the default of the subcontractor." It may be stated as a general proposition that the Contract Settlement Act of 1944 prescribes methods and procedure for Governmental contracting agencies for determining speedy and fair compensation under terminated war contract claims. For purposes of the instant proceeding a brief analysis of some of the provisions of that act will be helpful. It is noted that section 6 of that act provides, inter alia, (in subparagraph b) that each agency shall establish methods and standards for determining fair compensation on the basis of certain standards of cost, or percentage of contract price for work completed, "or on any other equitable basis" deemed appropriate; (in subparagraph c) that settlement may be made by agreement which is conclusive with certain exceptions or made by determination by the contracting agency; (in subparagraph d) that where made by determination the methods and standards established shall take into account certain items of costs, etc., including "such allowance for profit on the preparations made and work done for the terminated portion of the war contract as is reasonable under the circumstances"; and (in subparagraph g) that war contracts which did not provide for fair compensation for termination shall be amended to provide therefor. Section 13 of the act provides, inter alia, that an aggrieved war contractor may appeal to an Appeal Board or bring suit against the United States in the Court of Claims or a United States District Court.

Respondent contends that Mimeograph 5897 is a reasonable and therefore valid exercise of his authority, under sections 41 and 42 of the Internal Revenue Code, to prescribe a method of reporting income from compensation for termination of war contracts so as to reflect income clearly and prevent distortion in tax accounting; that the method therein prescribed is consistent with recognized principles of tax accounting; and that the prescribed method is proper even if inconsistent with standard accrual accounting practices. Respondent argues that petitioner's expenses connected with performance of its subcontract prior to cancellation were deductible in the years in which

incurred and reduced excess profits net income for those years; that to include the $289,815.54 in 1947 income would allow it to escape excess profits taxation resulting in a distortion in tax accounting; and that while the inclusion of that amount in income for 1944 under Mimeograph 5897 is not a perfect solution, the result is less distortion in tax accounting than postponing the inclusion until 1947. Respondent further argues that upon enactment of the Contract Settlement Act of 1944 petitioner became definitely entitled to receive compensation for the termination of its war contract and while there remained the necessity of a determination being made of the amount of compensation the latter could be estimated by petitioner with reasonable accuracy at that time, i. e., in 1944, and accordingly Mimeograph 5897 is a reasonable application of principles of tax accounting and is fully supported by *Continental Tie & Lumber Co.* v. *United States*, 286 U. S. 290.

Petitioner contends that its claim against Ford was an unliquidated claim for damages which under the standard accrual method of accounting was not properly accruable in income until 1947 when events occurred definitely fixing the right to receive income and the amount thereof became certain or determinable with reasonable accuracy; that its treatment of the settlement with Ford as income for 1947 was in accordance with the accounting method regularly employed in keeping its books and correctly reflected its income; and that Mimeograph 5897 should not be construed as requiring an inclusion in 1944 income of the amount of the 1947 settlement, but if it must be so construed then it is unreasonable and invalid.

In the instant case we are not concerned with the contract termination payment (incidentally received in 1944) for work done up to the time of the cancellation of job No. 1700, for that payment was not embraced in the claim involved herein. The issue involves petitioner's claim for damages in not being permitted to perform the portion of job No. 1700 which was cancelled in 1942, and whether on account thereof the amount of $289,815.54, received under a final settlement agreement in 1947, is includible in income for 1944. The mere fact that petitioner's books of account did not reflect such item as accrued income for 1944, based on the opinion of its accountants that the item was not accruable, is not conclusive.

Respondent urges that his determination is consistent with standard accrual accounting practices but, if not, it is nevertheless consistent with recognized principles of tax accounting clearly to reflect income and is therefore reasonable. In our opinion, the respondent's determination is contrary to the established general principles of accrual accounting as to accepted standard practices and also for tax purposes. Unless the circumstances herein are exceptional be-

cause of the enactment of the Contract Settlement Act of 1944, the petitioner's taxable year 1944 can not be brought into focus as having any bearing upon when income accrued to it under its claim for damages against Ford. The contract termination giving rise to the claim for damages occurred in 1942. The contract contained no provision, nor was there any other agreement in effect between the parties setting any formula for liquidated damages and the claim remained in dispute, both as to liability and amount, until the final settlement agreement was reached in 1947. Throughout that intervening period, Ford's denial of *any* liability was on the ground that petitioner was in default in performance and the cancellation did not occasion any legal damages. Furthermore, up to that time the Navy Department steadfastly refused its approval of Ford's paying any amount on the basis of various proposed settlements made by petitioner. Thus, aside from any factual or legal effect which may have arisen from the enactment of the Contract Settlement Act, the facts establish that, in 1944, petitioner had no *fixed right* to receive payment in any amount on its disputed claim for damages for contract termination and there could be no account receivable which was accruable in income of petitioner in 1944, for tax purposes. The cases uniformly agree that before an item of income or expense may be accrued there must be a fixed or determined right to receive or pay an amount. *Spring City Foundry Co.* v. *Commissioner*, 292 U. S. 184; *United States Cartridge Co.* v. *United States*, 284 U. S. 511; *Lichtenberger-Ferguson Co.* v. *Welch* (C. A. 9), 54 F. 2d 570; *Luckenbach Steamship Co.*, 9 T. C. 662; *William Justin Petit*, 8 T. C. 228; and *Jamaica Water Supply Co.*, 42 B. T. A. 359, affd., 125 F. 2d 512, certiorari denied, 316 U. S. 698.[2]

The above stated principle as to the necessity of a fixed right to receive a reasonably ascertainable amount to establish accrued income, has its counterpart in the necessity of a fixed liability to pay an ascertainable amount to support an accrued deduction from gross income, *United States* v. *Anderson*, 269 U. S. 422; *Dixie Pine Products Co.* v. *Commissioner*, 320 U. S. 516; *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281; and *Virginia Stage Lines, Inc.*, 16 T. C. 557.

In our opinion, the facts herein clearly distinguish the instant case from *Continental Tie & Lumber Co.* v. *United States*, *supra*, relied on by respondent as fully supporting his determination of petitioner's tax liability for 1944. In the *Continental Tie & Lumber Co.* case the Court sustained the Commissioner in taxing as accrued income in 1920, an award which was determined in amount and paid in 1923 under the Transportation Act of 1920 [49 U. S. C. A. 377], authorizing payment to railroads for partial redress for losses on account of operating

[2] The *Cartridge* case involved a war contract termination claim which was wholly contingent as to the right to receive payment, if any, until final settlement was made subsequent to the taxable year there involved.

deficits suffered during the period of Federal control of railroads. The Court found that the taxpayer's "right to the award was fixed" and again its "right to payment ripened" when the Transportation Act became law and that what thereafter "remained was mere administrative procedure to ascertain the amount to be paid." The Court said the case did "not fall within the principle that, where the liability is undetermined in the tax year, the taxpayer is not called upon to accrue any sum [*Lucas* v. *American Code Co.*, 280 U. S. 445, 50 S. Ct. 202, 74 L. Ed. 538]," but presented a problem of whether, upon the taxpayer's own data and the calculations required by the statute, the amount of the award could be ascertained within reasonable limits. All the basic facts to support the necessary data had transpired prior to 1920, and the Court concluded that the taxpayer's "books and accounts fixed the maximum amount of any probable award" and "it could have arrived at a figure to be accrued for the year 1920." In the instant case the factual circumstances are materially different for, in our opinion, not only was the *right* of petitioner to receive payment vigorously contested, but also, the claim was speculative in amount for services never to be performed rather than for a reasonably ascertainable amount based on events which had already occurred. Here, Ford denied liability and the Navy refused to approve any payment on the claim both before and after enactment of the Contract Settlement Act of 1944. A study of that act convinces us that its passage did not ripen in petitioner any *fixed right* to payment on the particular character of claim involved herein. We must remember that petitioner was a "subcontractor." With this in mind the following language of the Court in *Rumsey Manufacturing Corporation and Arthur T. McAvoy, Trustee in Bankruptcy* v. *United States Hoffman Machinery Corporation* (C. A. 2), 187 F. 2d 927, becomes pertinent:

It appears to us that the scheme or plan of the Act is reasonably apparent. It was of course to be expected that "prime contractors" would let out some of the work to subcontractors, that the accounts between the two would have to be settled, and that the "prime" contractor would wish whatever he paid the subcontractor to be credited to him in his own settlement with the "agency." Thus the "agency" had a lively interest in the "prime contractor's" settlement with his subcontractor which § 7 (a) recognized when it gave the "agency" power to "approve" the terms which the contractor was willing to tender to the subcontractor, or to "ratify" his settlement, if he had made one, or to "authorize" him to settle on his own terms if it thought him "reliable" enough. These courses the "agency" might take as between the contractor and itself; and they involved no action by it *vis-à-vis* the subcontractor. However, it might happen that the subcontractor, although by hypothesis he had no contract with the "agency," was so unreasonable in his demands upon the "prime contractor" that he was blocking that speedy settlement which the Act was especially designed to promote. In that event the "agency" might intervene directly and "settle" the subcontractor's claim, though *only in case it had been able to induce the*

*subcontractor to consent by offering the liability of the United States.* In that event § 13 would come into play and we may assume that, if that happened, the subcontractor might not sue the contractor. Be that as it may, in the *absence of such an agreement the "agency" was not authorized to "settle" a subcontractor's claim at all,* and there is no reason to suppose that the Act meant to put any limitations upon his action at common-law against the contractor. The only exception is that the regulations require all subcontractors promptly to file with "prime contractors" any claims they might have against them.* [Emphasis added.]

Nowhere in the record before us can we find that petitioner's claim was settled directly by the "agency" or that the United States became liable for petitioner's claim, albeit the Navy Department took a hand in negotiations and finally did approve the settlement between Ford and petitioner. Nor do we find anything in the Contract Settlement Act by which the "agency" could force the petitioner to submit its claim to the procedure laid down in the Act. So far as petitioner was concerned under the Act, it was free to proceed with an action at law against Ford had it not been able to agree on a settlement. In our opinion, the enactment of the Contract Settlement Act is without significance in this proceeding.

We conclude that at all times prior to the final settlement in 1947 petitioner's disputed claim against Ford remained wholly contingent both as to the right to receive payment and the amount receivable, if any, and that respondent erred in including the sum of $289,815.54 in petitioner's income for the year 1944.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

*§ 845.521-3, Joint Termination Regulation, 9 Fed. Reg. 13359.