Littleton, Judge (Bet.),
delivered the opinion of the court:
Plaintiff, an accrual basis taxpayer, sues to recover income and excess profits taxes paid for its fiscal year ended September 30, 1945 (hereinafter called fiscal 1945). The taxes in question, in the amount of $744,548.35, were paid upon a profit allowance of $906,621.81 received by plaintiff on a contract termination claim which was actually paid in 1946 and 1947. The issue in the case is whether plaintiff was properly required by the Commissioner of Internal Revenue to accrue this sum as income for fiscal 1945, when its contract was terminated. Plaintiff claims the sum was not properly accruable until 1946.
It is clear that if, in fiscal 1945, plaintiff had a fixed right to receive a reasonably ascertainable amount as a profit allowance, that amount was properly accruable in that year. Continental Tie and Lumber Co. v. United States, 286 U.S. 290. When books of account are kept, and tax returns prepared, on the accrual, rather than cash, basis, the time when a right to receive or a liability to pay an ascertainable amount becomes fixed, and not the time of actual receipt or payment, is decisive of the proper time for accrual. Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 184-5; Security Mills Co. v. Commissioner, 321 U.S. 281.
The question here, therefore, is whether in fiscal 1945 plaintiff’s right to receive payment on its termination claim was a fixed right to receive a reasonably ascertainable amount.
Plaintiff, a Delaware corporation with its principal office at San Jose, California, was engaged in the manufacture of amphibian tanks and spare parts under fixed-price contracts with the Department of the Navy during World War II.
The eleven contracts involved in this case were entered into between plaintiff and the United States Navy’s Bureau of *654 Ships from November 1943 to July 1945. They were all war contracts within the coverage of the Contract Settlement Act of 1944, 58 Stat. 649, 41 U.S.C. §101, and of the Joint Termination Regulation, as amended.[1]
Eight of the contracts contained termination clauses providing for fair compensation, including a profit allowance, to be paid to plaintiff in the event the contracts were terminated for the convenience of the Government. The parties were to attempt to negotiate the amount of the profit allowance, but if no agreement could be reached, plaintiff was to receive a profit equal to 2% of the cost of material purchased by plaintiff but not yet processed, plus 8% of the cost of work in progress, but not more than 6% of the total of the above costs. Plaintiff’s records indicated what material was purchased for each contract, but items common to several contracts were physically commingled. As work in process, plaintiff’s books showed labor, burden and raw materials fabricated by plaintiff, but not material furnished by plaintiff to its subcontractors, or purchased components and material, which plaintiff placed in the finished goods account when items were completed. At any given time, only a physical count, and not plaintiff’s records, could have disclosed the actual work in process. No effort was made by plaintiff to determine the actual amount of work in process on the contracts here involved.
Plaintiff’s eleven contracts were terminated under the provisions of the Contract Settlement Act of 1944 and the Joint Termination Regulation, by termination notices issued between July 20 and August 30,1945.
Plaintiff had become aware, early in 1945, that its contracts might be terminated. On June 20 and 21 and during the week of July 2, pretermination conferences were held between plaintiff’s representatives and representatives of the Bureau of Ships, headed by Captain Rosenstein, the contracting officer in charge of plaintiff’s contracts. The parties discussed means of calculating costs due to cancellation, the manner of counting and classification, preservation and disposal of inventories, the rate of profit plaintiff was to receive, and the approximate amounts involved. Plaintiff proposed a 6.4% rate of profit; the Navy offered the terms generally- *655 used by it of 3% on materials and purchased parts and 10% on work in process. Plaintiff’s estimate of work in process as at least 25% of its inventories would have yielded an overall rate of 4.75% at the Navy’s terms. Discussion led to an oral agreement on a profit rate of 4.875%, upon which basis plaintiff would submit its termination claims.
On July 19,1945, the Bureau of Ships submitted to plaintiff a draft pretermination agreement referring to five of plaintiff’s contracts. The draft provided a 4.875% rate of profit which was to include packing expenses, and contained extensive provisions relating to inventories, classification of items and pricing of materials.
Plaintiff did not reply formally to the July 19 proposal and no pretermination agreement was executed, for the war had ended and the contracts were terminated. Plaintiff’s post-termination activities proceeded under the Joint Termination Eegulation.
When plaintiff received the termination notices, work was stopped, suppliers and subcontractors notified to stop work, and preparations for inventory counts made. Work in process then on feed lines of subcontractors and subassembly lines of plaintiff’s largest plants was reviewed with Navy representatives and disposition of some of this material was determined. Subassemblies not used as such in spare parts were disassembled and their parts returned to stock bins. Semifabricated pieces were scrapped, and materials in process returned to stock bins. The return of parts and materials to the bins was with the approval of the Navy.
Under the circumstances, when plaintiff’s inventory was taken, it was not possible to distinguish between purchased parts and raw materials on the one hand and work in process on the other.
On August 29,1945, plaintiff asked to be permitted to file two joint inventory and settlement proposals, each covering four of the terminated contracts. Captain Rosenstein, by letter of September 21,1945, approved plaintiff’s request.
At a meeting on September 18, 1945, plaintiff’s president and Captain Rosenstein reached an understanding that the 4.875% profit rate remained mutually agreeable and would be claimed by plaintiff and allowed by Captain Rosenstein. *656 Captain Eosenstein’s letter of September 21 confirmed this understanding. It was also understood that the rate of profit was subject to review by the Government’s Settlement Eeview Board in Washington, D.C.
This, then, is the stage to which matters had progressed when plaintiff’s fiscal year came to an end on September 30, 1945.
On November 12, 1945, plaintiff requested permission to consolidate some of its termination claims, setting August 17,1945, as consolidated termination date. Three days later, it asked to be permitted to submit one settlement proposal covering all its terminated contracts, apportioning charges fro rata. This requested procedure was authorized verbally by Captain Rosenstein on or about November 26, which authorization was confirmed by the Supervisor of Shipbuilding by letter dated December 7.
On November 27 plaintiff filed its first settlement proposal. The claim stated a total inventory of metals, purchased parts, finished components and work in process of $18,618,-592.43. Applying the 4.875% rate of profit, plaintiff claimed a profit of $907,656.38-.
The claim was received by the Bureau of Ships’ Contract Termination Section in Washington on or about January 3,
1946. With the claim was a report dated December 14,1945, by the Navy’s Supervisor of Shipbuilding responsible for plaintiff’s contracts. The report stated that Navy personnel had examined the inventories and checked prices, finding materials in good condition and properly allocable to the terminated contracts. The report did refer to such questionable items in the claim as plaintiff’s failure to deduct cash discounts from costs. Since plaintiff waived other items of cost which it might have claimed, no adjustment was required. The report also noted that the requested profit was based on the rate agreed upon at the meeting of September 18, 1945, although purchased parts constituted a larger percentage of total inventories than appears to have been anticipated during the negotiations about profit rate.
At a meeting on January 8, 1946, between representatives of plaintiff and of the Navy, plaintiff was asked to apply for partial payment of its claim. Although plaintiff refused to *657 apply, partial payment in the amount of $18,500,000, representing approximately 95% of plaintiff’s total claim was received, approved, and paid to plaintiff’s president on January 10. The amount paid was less than the sum claimed for inventories and did not represent any allowance for profit or disposal credits.
At the January 8 meeting, plaintiff was also asked to supply material which would explain the variation between the estimated figure of 25% representing work in process and the 7% reflected in plaintiff’s claim filed November 27,1945. In a letter dated February 13,1946, plaintiff pointed out that it had included as work in process only such items as were unquestionably that, while much work which could properly have been included was omitted due to the impossibility of segregating and identifying it. Plaintiff noted additional items which would have been properly classified as work in process but which had not been so classified, and also agreed to waive certain substantial items of cost.
On March 26, 1946, Captain Eosenstein submitted to the Settlement Eeview Board written proposals for settlement of plaintiff’s claim. Except for freight charges in the amount of $21,222, Captain Eosenstein recommended approval of plaintiff’s claim as submitted. This exception reduced the profit allowance to $906,621.81. The Board’s approval was given on March 27, and its action was in turn approved by the Chief of the Bureau of Ships.
An April 11, the Navy submitted to plaintiff for execution two supplemental agreements covering plaintiff’s termination claim as approved, and plaintiff returned executed copies on May 21. Payments of the amounts due on these contracts, less the $18,500,000 already paid on January 10, were made to plaintiff on June 12 and 13, together with interest from the date of the agreements to the date of payment.
These two agreements, pursuant to the claim filed November 27,1945, covered only plaintiff’s own claim, and did not include subcontractors’ termination claims or settlement expenses incurred by plaintiff after October 1,1945. Between November 27,1945, and October 22,1946, plaintiff submitted *658 ten additional claims, which covered these additional claims and expenses.
The tenth interim settlement proposal, submitted on September 9, 1946, included a claim for settlement expenses incurred by plaintiff since October 1,1945, totaling $590,077.65.
Plaintiff’s twelfth and final settlement proposal was submitted to the Navy on October 22, 1946. Final disposition of plaintiff’s claims was made on the basis of this proposal.
■ The total of plaintiff’s previously allowed inventories of metals, purchased parts, finished components and work in process was $18,597,370.43. A profit of 4.875% thereon, totaling $906,621.81, as allowed on plaintiff’s first claim, was included. This produced a total of $19,503,992.24. After a deduction of $283,841.87 for disposal credits, a balance to be claimed of $19,220,150.37 remained. Various interest charges totaling $160,745.10 were added, as was an allowance of $590,077.65 for settlement expenses, as set forth in the tenth interim proposal.
On November 19, the Bureau of Ships’ contracting officer recommended approval of the final proposal, and the Settlement Eeview Board approved it on November 26. Final settlement was approved by the Chief of the Bureau of Ships. Execution of the final contracts and final payment to plaintiff of the balance due it were completed by January 9, 1947.
The $906,621.81 allowed to plaintiff as profit on its terminated contracts was included in plaintiff’s ordinary net income, surtax net income and excess profit net income for its taxable year ending September 30, 1945. Plaintiff filed a timely claim for refund of income and excess profits taxes in the amount of $652,767.67 for that year, on the grounds that the $806,621.81 profit was not properly includible in that year’s income. The Commissioner of Internal Bevenue disallowed plaintiff’s claim on April 24, 1952, and plaintiff’s petition was timely filed in this court on April 8, 1954.
It is in light of these facts and circumstances that we must determine whether plaintiff’s right to receive termination payment from the Government was fixed in fact and in amount in its taxable year ending September 30,1945.
There is no dispute between the parties as to the fact of *659 plaintiff’s right, in 1945, to receive some payment from the Government. The parties differ on the question of whether this right was sufficiently fixed in amount.
Plaintiff says that the right to receive a profit allowance was not reasonably ascertainable in amount until 1946, when its termination claims were settled. It argues that although the Contract Settlement Act gave it the right to fair compensation for termination of its contracts, the Act did not establish a right to receive any ascertainable amount.
Defendant maintains that the amount payable to plaintiff was readily ascertainable from its books and records as of the close of its taxable year. Defendant says that plaintiff had both a contract and a statutory right to fair compensation, including profits, for work undertaken prior to the date of termination. While the contracts and the Contract Settlement Act provided that negotiated settlements should be attempted, those contracts which contained the Uniform Termination article specified that, if agreement could not be reached, plaintiff was entitled Sto a profit allowance of 2% of the cost of purchased articles or materials, plus 8% of the cost of work in process, not'to exceed 6% of total costs.
Section 6 of the Act, 41 U.S.C. § 106, requires contracting agencies to provide speedy and fair compensation for termination of war contracts. 41 U.S.C. § 106(a). Each agency is required to establish methods and standards for determining fair compensation.
on the basis of actual, standard, average or estimated costs, or of a percentage of the contract price based on the established percentage of completion of work tuider the terminated contract, or on any other equitable basis, as it deems appropriate. 41 U.S.C. § 106 (b).
Such methods and standards are to take into account certain specified items of cost, 41 U.S.C. §106 (d) (l)-(7), and to exclude others, § 106(d) (i)-(iv).
The agency may settle a termination claim by agreement with the contractor, or by unilateral determination of the amount due on the claim, or by a combination of both methods. 41 U.S.C. § 106(c). No settlement providing payment of more than $50,000 is to be binding on the Government until reviewed and approved by a Settlement Ee- *660 view Board. 41 TJ.S.C. § 106(c). Claims are to be settled by agreement to tbe maximum extent feasible. 41 TJ.S.C. § 106(e).
Plaintiff argues that, far from establishing definite and precise standards for determining fair compensation, the Act gives Government agencies broad discretion in settling termination claims. Plaintiff says that the amount of compensation to which it was entitled could not be determined from an examination of the Act, nor even from an examination of plaintiff’s books and records, and that the amount of compensation could not be known until a negotiated settlement of plaintiff’s claims had been reached.
As we have said, plaintiff does not deny that it had a right to receive something, but it says that the amount remained in doubt at the close of fiscal 1945. Plaintiff says that the following factors rendered doubtful the amount it was to receive: the Contract Settlement Act did not provide any formula for determining fair compensation; questions concerning the form of plaintiff’s claims and the method of allocating items among the various contracts had not been settled; difficulties in classifying plaintiff’s inventories as raw materials, purchased parts or work in process and in determining allowable costs, led to uncertainty in the calculation of a proper profit allowance; in any event, the amount of the profit allowance was not fixed until approved by the Navy’s Settlement Review Board and the chief of the Bureau of Ships.
Continentdl Tie and Lumber Co. v. United States, 286 U.S. 290, is said by defendant to be controlling here. In that case, an accrual basis taxpayer challenged the Commissioner of Internal Revenue’s inclusion of the amount of an award of the Interstate Commerce Commission under § 204 of the Transportation Act of 1920, 41 Stat. 456, 460, as income for the year in which the Act was passed, rather than the year in which the amount of the award was determined and paid.
The Supreme Court stated that the problem presented in the Oontinentdl Tie case was
whether the taxpayer had in its own books and accounts data to which it could apply the calculations required by *661 the statute and ascertain the quantum of the award within reasonable limits. 286 U.S. at 296.
§ 204 of the Transportation Act provided for an award and payment to a railroad which, during a period of federal control of some railroads at the time of the first world war, had operated its own road but had competed for traffic with a railroad which had been under federal control, and had sustained a deficit in operating income during the time when it operated its own railroad.
The Interstate Commerce Commission was to compare the results of the railroad’s operation during the period of federal control with those during a defined test period, and, if the results for the period of federal control were less favorable, to make an award in an amount calculated in the manner prescribed by the section.
The Transportation Act became effective February 28, 1920, and on June 10 the Interstate Commerce Commission issued general instructions for carrying § 204 into effect. The award and payment were made to the taxpayer in 1923, and the taxpayer claimed that the sum should be deemed income in that year, rather than in 1920, because the amount depended upon so many contingencies that no reasonable estimate thereof could have been made in 1920.
The Court held the amount properly accruable in 1920, stating:
the function of the Commission under the act was ministerial, to ascertain the facts with respect to the carrier’s operating income by a comparison of the experience during the test period with that during the term of federal control. The right to the award was fixed by the passage of the Transportation Act. What remained was mere administrative procedure to ascertain the amount to be paid. Petitioner’s right to payment ripened when the act became law. 286 U.S'. at 295.
The Court went on to point out that the railroad kept its accounts according to standards prescribed by the Interstate Commerce Commission, and that these accounts were the source of the information on winch the amount of the award would be based. Although general principles for the determination of relevant factors had been formulated *662 by the Act, there were questions of fact to be resolved by the exercise of opinion and judgment. The Court pointed to the presence of questions concerning the time for closing out reserve accounts, the allocation to the period in question of sums expended for maintenance, the price at which renewals and replacements should be charged in view of rising costs, and the allowance to be made for differing efficiency of labor in the two relevant periods. These questions seem quite similar to the questions concerning allocation of costs, subcontract charges, and inventories, and concerning an effective termination date, which existed in this case at the close of the taxable year in question.
Despite the existence of these questions, the Court thought that
it was possible for a carrier to ascertain with reasonable accuracy the amount of the award to be paid by the Government. Subsequent to its order of June 10, 1920, the [Interstate Commerce] Commission made no amendment or alteration of the rules with respect to the information to be furnished under § 204. Obviously the data 'had to be obtained from the railway’s books and accounts and from entries therein all made prior to March 1, 1920: These accounts contained all the information that could ever be available touching relevant expenditures. 286 U.S. at 291.
We think, therefore, that, under the reasoning of the Continental Tie case, the cost and inventory figures, which were to constitute a part of the basis for calculating plaintiff’s profit allowance, were ascertainable within reasonable limits during the taxable year in question.
However, in this case, the amount which would be paid to plaintiff did not depend solely upon the cost and inventory figures contained in its books and accounts, or upon quantities which could be reasonably calculated on the basis of those figures and upon physical inventories on hand. Under the Contract Settlement Act of 1944, the rate of profit to be allowed was left for negotiation by the parties. It was to be a figure which would provide “fair compensation” to the contractor. While the questions in this case as to the amounts of cost and inventory items were quite similar to the questions which existed in Continental Tie as to the calculation *663 of certain factors, the difference between the cases lies in tbe fact that, under the Transportation Act, once such calculations were made, the amount of the award was established, while under the Contract Settlement Act, after the determination of cost and inventory figures has been made, there still remains for determination a factor which is not established by the Act, that is, the rate of profit to be allowed upon the cost and inventory figures. Thus, under the Contract Settlement Act, the taxpayer’s books and accounts and inventories do not contain all the material, however debatable its treatment may be, relevant to a determination of the amount which it will receive, as they do under the Transportation Act.
We must, then, consider whether the rate of profit which plaintiff was to receive had been sufficiently established prior to the close of fiscal 1945 to permit plaintiff’s profit allowance to be reasonably ascertained. Plaintiff says that the rate of profit was not fixed until it was approved by the Settlement Beview Board, as required by § 6(c) of the Contract Settlement Act and paragraph 582.1 of the Joint Termination Begulation. Approval by the Settlement Be-view Board did not take place until March 27, 1946. We think, however, that final, formal approval of the proposed settlement was not necessary to give it sufficient definiteness in amount. Under paragraph 503(a) of the Joint Termination Begulation, the “sole function of the settlement review board is to determine the over-all reasonableness of the proposed settlement from the standpoint of protecting the Government’s interest.” The substance of the settlement proposal was to be and in this case had been worked out between the contractor and the Government’s contracting officer. Their agreement, reached with no visible discord, and giving rise to no apparent question as to over-all reasonableness, established plaintiff’s right in a reasonably ascertainable amount. We do not think that lack of formal approval by the Settlement Beview Board deprives the amount of sufficient certainty any more than lack of the action by the Interstate Commerce Commission in making an award to the railroad, which action was admittedly necessary before any payment could be made, affected the railroad’s right in *664 the Continental Tie case. See also Commissioner of Internal Revenue v. Dumari Textile Co., 142 F. 2d 897, at 899-900, 47 B.T.A. 639, at 646.
Plaintiff says that it was not until the completion of negotiations between it and the Navy some time in 1946 that the amount of profit allowance was determined. The Navy’s contracting officer did not submit plaintiff’s proposal to the Settlement Review Board for approval until March 26,1946. Plaintiff says that this is because he had been awaiting the February 13 letter from plaintiff justifying the claimed rate of profit, which had been questioned at the January 8 meeting.
We note, however, that a profit rate of 4.875% had been first suggested and tentatively agreed upon in the course of the pretermination conferences which took place in June and early July of 1945. Defendant’s representatives prepared, and submitted to plaintiff on July 19, a draft of a pretermination agreement incorporating the 4.875% profit rate. While this draft was not in final form and did not bind the parties, and in fact no pretermination agreement was ever entered into between the parties, representatives of the parties met, after termination of the contracts, on September 18 and concluded that the 4.875% profit rate previously agreed upon remained mutually agreeable. The Government contracting officer’s letter of September 21 to plaintiff stated:
the Contracting Officer on behalf of the Bureau of Ships, and Mr. Davies on behalf of the Contractor, agreed that this profit figure of 4.875%, which had previously been agreed upon for purposes of the pre-termination agreement, was mutually agreeable and would be claimed and allowed in the termination claims submitted by the Contractor under the subject contracts.
It is true that plaintiff did not actually submit its first termination claim until November 27, 1945, and that in January 1946 the contracting officer requested information from plaintiff in support of its claim. No challenge to the profit rate was made; the purpose of the contracting officer’s request for material justifying the profit rate appears to have been to have available in the record an explanation of why the plaintiff’s accounts reflected work in process of only *665 7%, whereas the profit rate agreed upon was predicated upon work in process somewhat in excess of 25%. The record does not show that any suggestion was made that the profit rate be reconsidered after September 30, 1945, nor that the profit rate was in fact reconsidered at any time. Plaintiff asserts that even if the rate of profit was sufficiently settled, no specific amount representing the costs to be allowed, to which the rate of profit was to be applied, had been mentioned or agreed upon by the parties. We think, however, that the teaching of the Continental Tie case is that no specific amount need be mentioned, as long as the information relevant to determination of the amount is available. We think that information was available in this case.
We think that under the facts and circumstances of this case, negotiations between the parties had reached a stage of sufficient agreement by the end of fiscal 1945 for the amount of plaintiff’s profit allowance to be considered reasonably ascertainable at that time.
Plaintiff’s principal reliance is on two cases, Breeze Corporations, Inc. v. United States, 127 Ct. Cl. 261, 117 F. Supp. 404, and Apex Electrical Mfg. Co., 16 T.C. 1171, affirmed per curiam, 202 F. 2d 151 (6 Cir.).
In the Breeze case, an accrual basis taxpayer, a second tier subcontractor under war contracts which were terminated in 1945, had included in its tax returns for 1945 an item of some $75,000, representing an amount it believed would be due to it from the first tier subcontractor on the terminated portions of its contracts. The taxpayer subsequently claimed that its accrual of the $75,000 in 1945 had been erroneous because it had no fixed right to that or any reasonably ascertainable amount during the year 1945.
The $75,000 represented the estimated value of certain pumps which were manufactured by the taxpayer. The taxpayer was engaged in manufacturing pumps of the kind in question under a prime contract with the Navy as well as under its subcontract, and there was a question as to whether the pumps were properly allocable to the subcontract or to the prime contract. The Government claimed that because the first tier subcontractor had not denied the *666 claim in 1945, the taxpayer had a fixed right to payment in that year.
The court noted, however, that the taxpayer’s estimate of inventory applicable to the terminated contracts had not been approved or allowed in 1945 either as to its value or as to its allocability to the terminated contracts. The court found that voluminous correspondence, many conferences and partial settlement agreements, a complete denial of the claim at one time and negotiations continued for several years resulting in a settlement for one-third of the original claim sufficiently demonstrated “there was a serious dispute as to whether any or all of the pumps were allocable to the terminated contracts.” 127 Ct. Cl. at 272. The court concluded, therefore, that it was “apparent that both the right to payment and the amount, if any, payable remained uncertain until settlement of the dispute in 1949.” 127 Ct. Cl. at 273.
Here there was no “serious dispute” as to allocation of any items of inventory. Though there would have been substantial difficulty in physically separating materials from work in process here, the necessity for so doing had been obviated by the agreement at an early stage in the negotiations that the profit allowance would not be based upon different percentages of the costs of materials and work in process, but rather upon an agreed-upon percentage of total costs. In Breeze the parties at the close of the taxable year in question stood in conflict as to the allocation of the pumps; in the case at bar the only matters undetermined at the close of fiscal 1945 were of the nature of those described by the Supreme Court in Continental Tie as not making it impossible to determine with reasonable accuracy the amount of the payment to be made by the Government. 286 U.S. at 297.
The Apex Electrical Mfg. Co. case, 16 T.C. 1171, is of no help to plaintiff, since in that case the fact of liability itself was denied during the taxable year in issue, and the court found that there had been no fixed right to receive any amount.
Globe Corporation, 20 T.C. 299, also relied on by plaintiff, is not helpful either, since, although the taxpayer there, in *667 the taxable year in question, did, as plaintiff says, have a right to receive fair compensation, the negotiations between the parties had not in that year reached any agreement, however tentative, on the amount, or method, of computing the amount of fair compensation.
We have carefully examined all of the other cases cited by plaintiff, but it is clear that they do not support plaintiff’s position in this case, and they do not warrant discussion.
Plaintiff is not entitled to recover, and its petition will be dismissed.
It is so ordered.
LaeamoRe, Judge; Madden, Judge; and Jones, Chief Judge, concur.

 9 F.R. 13316 ; 10 F.R. 10793, 13189 ; 11 F.R. 28, 1728, 4226, 6295, 11479.